THE STATE OF OHIO, APPELLEE, *v.* ROGERS, APPELLANT.

(Decided November 15, 1938.)

*Mr. Carl T. Stouffer,* prosecuting attorney, and *Mr. J. E. Bauknecht,* for appellee.

*Mr. Frank H. Hoover* and *Mr. Samuel M. Chertoff,* for appellant.

CARTER, J. Burl Rogers, appellant, Dudley Adams and Clinton Daniels were jointly indicted by the Grand Jury of Columbiana county for murder in the first degree while attempting to commit a robbery. Separate trials were granted by the trial court. To this indictment Rogers plead "not guilty." Dudley Adams was tried first, resulting in a verdict of "guilty of first degree murder," the jury recommending mercy, was sentenced and is now incarcerated in the Ohio Penitentiary for the balance of his natural lifetime. Rogers demanded a bill of particulars under the statute which was furnished by the state. The bill of particulars setting out more in detail the nature and character of the offense charged is substantially as follows:

"The defendants Burl Rogers, Dudley Adams and Clinton Daniels on the 25th day of December in the year of our Lord one thousand nine hundred thirty-five, at the county of Columbiana aforesaid, unlawfully, purposely and while attempting to perpetrate a robbery, killed one Clarence Dickey, contrary to the statute in such case made and provided and against the peace and dignity of the state of Ohio.

"The evidence on behalf of the state will show that all three of the defendants who stand jointly indicted, in the early morning of December 25, 1935, and prior to about four o'clock on said morning were at the home of Paul and Bessie Higgins in what is known as Dry Run in the east end of East Liverpool, Ohio, and that they conspired to rob Frank and Clarence Dickey; that the three said defendants, in accordance with said conspiracy and in furtherance thereof, and as a joint enterprise and as aiders and abettors to each other, left the home of Paul and Bessie Higgins shortly before four o'clock on this morning, and the defendant Dudley Adams went to his home where a little bit later the defendants Burl Rogers and Clinton Daniels came back for him and the three proceeded to the city of

East Liverpool in the automobile of the defendant Burl Rogers, and that about four o'clock the delivery wagon of said Frank and Clarence Dickey was standing at the corner of Fawcett street and Thompson avenue, and the automobile of the defendant Burl Rogers was parked a little ways down Fawcett street from Thompson avenue, and the defendants Dudley Adams and Clinton Daniels, both with guns, forcibly attempted to rob the said Clarence and Frank Dickey, while the defendant Burl Rogers remained in his automobile parked on Fawcett street; that while attempting to perpetrate this robbery the defendant Clinton Daniels shot Frank Dickey in the arm and just as that happened Clarence Dickey started down Thompson avenue after the defendant Dudley Adams who then shot Clarence Dickey in the abdomen; that on the 26th day of December, 1935, and about two-twelve o'clock p. m. the said Clarence Dickey died, the direct proximate cause of his death being acute diffuse peritonitis from gun shot perforation of the intestine, directly resulting from being shot in the abdomen as aforementioned.''

The cause came on for trial to the court and jury resulting in a verdict of ''guilty of murder in the first degree,'' the jury recommending mercy. Motion for a new trial was filed, overruled and Rogers was sentenced to the Ohio Penitentiary for the balance of his natural lifetime. The evidence discloses substantially the following: Frank Dickey was employed by the Golden Star Dairy of East Liverpool as a milk deliverer. On Christmas morning, 1935, the delivery being somewhat heavier on that morning, he took with him his brother Clarence Dickey to assist in the deliveries. The outfit used in the delivery of this milk was a horse drawn delivery wagon with a platform at the rear from which the driver controlled the operation of same and handled the cases of milk to be delivered from this position, and at this place upon the wagon they filled the

carriers from which deliveries were made at the various houses along the route; that about four o'clock on Christmas morning while driving east on Thompson avenue the automobile belonging to Rogers, the appellant, occupied by Adams, Rogers and Daniels, met the Dickey boys, the car being driven in a westerly direction on Thompson avenue; that Frank Dickey and Clarence Dickey continued delivering milk for approximately one-half hour when the same automobile owned and operated by Rogers again passed these boys; that a short time thereafter this same car again passed them after they had started to ascend the hill on Thompson avenue. Shortly thereafter and when they were about 150 feet from the intersection of Thompson avenue and Fawcett street, Rogers' car again passed them proceeding in the same direction as was the wagon. Immediately after this last passing, Rogers, who was operating the car, stopped the same at a point about 75 feet from the place where the milk wagon stopped at the intersection of Fawcett street and Thompson avenue; that at this point Dudley Adams and Clinton Daniels left the Rogers car and proceeded back to the milk wagon where the boys were located; that Dudley Adams proceeded towards Frank Dickey who was returning from a delivery, at which time Clarence Dickey cried out, "Watch Frank, they both got guns"; that Dudley Adams pointed his gun at Frank Dickey who walked past him and was at the time proceeding towards the milk wagon; that Clinton Daniels was standing within a few feet of the milk wagon pointing a gun at Clarence Dickey who was then standing on the platform of the wagon; that Frank Dickey stepped on to the platform and Clinton Daniels made a demand that the boys hand over the milk; that at that time Frank Dickey picked up a milk bottle and threw it at Daniels who immediately fired at Frank Dickey, striking him in the arm wounding him and knocking him to the street;

that Clarence Dickey immediately left the wagon and started in the direction of Dudley Adams who was at this time proceeding towards the wagon; that as Clarence Dickey approached Adams, Adams fired his revolver and struck Dickey in the abdomen which caused his death on the following day. The evidence further establishes that during all of this time the car of Burl Rogers remained at the place where Adams and Daniels had left it, Rogers being at the time in the car. The evidence further discloses that Rogers in company with Adams and Daniels attended a drinking party at a place known as the ''Higgins home''; that they were armed and that they left this place at approximately two-thirty o'clock in the morning; that the three returned to the Higgins home about five o'clock in the morning. Rogers at first denied that he was with Adams and Daniels stating that he had loaned his car to these two men. He later admitted his presence in the machine and that he drove it at the time in question. The statement of Rogers which is made a part of the record establishes that he knew that his companions were armed and that a crime was to be committed when Adams and Daniels left his car. There is ample evidence in the record to establish the participation of Rogers in the planning of the crime and in the aiding in carrying out this plan. The evidence also establishes that the offense of which Adams was found guilty as principal was murder in the first degree while attempting to commit a robbery and inasmuch as the death of Clarence Dickey resulted from the acts of Dudley Adams while attempting to commit the crime of robbery the admissions of Rogers and the facts proven by the record constituted Rogers clearly an aider and abettor who was prosecuted as a principal under the provisions of Section 12380, General Code, which provides that: ''Whoever aids, abets, or procures another to commit

an offense may be prosecuted and punished as if he were the principal offender.''

Now it is urged by appellant in his brief that the theory of the defense is that there was a conspiracy entered into between these three men merely to steal a case of milk from the milk wagon and not to rob, and that there is no evidence in the record involving Rogers in any conspiracy to rob. However, it is admitted that there is found in the record the following testimony by Dudley Adams who was called as a witness for the state:

''Q. Will you tell what you did do then, downtown? A. Sure I can tell you.

''Q. Tell us what you did do? A. We was up Vine street and Clint (referring to Daniels) he suggests to stick that boy up.

''Q. Stick what boy up? A. I guess it's Dickey, what they call him. I don't know myself.

''Q. Where were you at that time? A. We was on Vine street.

''Q. In the car or not? A. We were in the car.

''Q. That's Burl Rogers, is that right? A. Yes.

''Q. Clinton Daniels and yourself? A. Yes.''

The record of the maneuvering about this milk wagon prior to the attempt to take the milk constitutes ample evidence to justify the jury finding that a conspiracy to rob was established and that Rogers was one of the conspirators. The car belonged to Rogers, he drove it on the night in question and was in the car waiting when the attempt to rob was being carried out by Daniels and Adams, this attempt to take milk occurring only about 75 feet distant from Rogers' car.

Now it is urged that the court allowed and permitted the prosecution to cross-examine and impeach the testimony of its own witness Dudley Adams. The basis of this claimed error is found in the testimony of Adams, one of the conspirators. Adams as hereinbefore

indicated had been previously tried and convicted of murder in the first degree and sentenced to the penitentiary. The state, relying on the testimony which he had given at *his* trial, called Adams from the penitentiary as a witness on its behalf in the trial of Rogers.

The following questions were propounded to Adams, as disclosed by the record:

"Q. Did Burl Rogers have a gun? A. I didn't see him with any.

"Q. Did you see Burl Rogers at any time that evening and morning with a gun? A. No.

"Q. Now just to refresh your recollection Dudley—

"Objection by the defendant to the cross-examination. (No action was taken by the court on this objection.)

"Q. May I ask you if at the time you testified in a former hearing of this cause in May, the latter part of May and the first part of June, 1936, if you said—

"Objection.

"A. Was that the statement I made?"

The prosecutor then said to the court: "On the theory we are taken by surprise on this statement of this witness and it's adverse to the state.

"By the Court: In what way are you taken by surprise?

"By the State: In that by reason of a previous trial we were informed by this defendant that Burl Rogers had a gun and by the gun compelled him to go up to the scene of the holdup which is contrary to his present statement and therefore adverse and that this is the statement I have had from Dudley Adams since the time of the trial of my conversation with him in the jail after his conviction and it now is contrary to that time.

"The Court then stated: In the case of *Hurley* v. *State,* 46 Ohio St., 320 [21 N. E., 645, 4 L. R. A., 161], to which I call counsel's attention there the rule is the

party who calls a witness and is taken by surprise but is unfavorable you may interrogate him in respect to declarations and statements previously made by him which are inconsistent with his testimony for the purpose of refreshing his recollection and inducing him to correct his testimony or explain his apparent inconsistencies and for such purpose a previous declaration may be imputed to him and he may be called upon to say whether they were made by him. Now the question may be asked and proceedings had in compliance with this rule as announced by the Supreme Court in this case. So you may proceed."

Exceptions were noted.

"Q. Dudley at that time did you say that Burl Rogers told you to go up to the wagon and that Burl had a gun? A. Yes, but I was on trial for my life then, you realize that don't you? That's when I put that in there absolutely.

"Q. I asked you if you said that at that time? A. Sure, I was on trial for my life at that time, too, see?

"Q. Did you also say at that time, 'I knowed maybe if I didn't do what he wanted he would plug me and so I went up and a man throwed a milk bottle'? A. I was on trial for my life then and I said that naturally. Sure.

"Q. And you wish to acknowledge that you said that at that time? A. Sure, at that time.

"Q. And were you there when the man threw the milk bottle? A. No, I weren't right there.

"Q. All right. I will ask you and for the same reason your honor (addressing the court), if at that time in May and June of 1936 you didn't say that you went up to the wagon and that the man 'throwed a milk bottle'?

"Objection.

"The Court: I am proceeding on the theory that counsel is taken by surprise as he stated before and that is admitted in compliance with the rule which I read from *Hurley* v. *State, supra*."

The following question was propounded:

"Q. And with regard to the conversation about the stickup you were telling us a while ago that Burl Rogers said nothing. Is that right? A. I couldn't call to recollect that he did.

"Q. All right, and by reason of the same situation I desire to ask the witness and I ask you Dudley if at the previous hearing of this case—

"Objection.

"Q. In May and June of 1936 if you didn't say that you went up the hill turned down the other street up there and Clinton said 'Burl let's get a case of milk' and Burl said 'Yes, we will get a case of milk.' A. Well, I told you a while ago I was on trial for my life and I naturally told you that or you wouldn't have it.

"Q. So you did say that? A. Yes, I said that."

Objection was made and motion was made that the question and answer be stricken from the record, which objection was overruled.

The following question was propounded to Adams:

"Q. I asked you, 'And when you returned to the machine where was Burl?' if you did not answer, 'Burl was in the car'?

"Objection.

"Did you make that answer?

"Overruled, exceptions.

"A. Well, I was on trial that time for my life and I told you in there, in there I told you we got in the car but we didn't.

"Q. I asked you just now, I am not interested in your explanation. I only want to know if you told me Burl was in the car? A. Sure I told you that.

"Q. Upon being asked by me, 'In the same place he was when you left?' did you answer, 'No, he was over to the side where Clint was sitting when we came back'? Did you make that answer? A. I don't recall to recollect whether I did or not.

"Q. Do you think you did? A. I won't say. I ain't positive.

"Q. And did I ask you, 'You mean he was not behind the wheel?' and did you say, 'No, not right then but he got behind the wheel'? Did you make that answer? A. I told you a while ago I was on trial for my life when I told you that.

"Q. I only want to know if you made that answer? A. I don't know. I ain't saying.

"Q. Did I ask you, 'Did he have his gun with him at the time?' and did you tell me, 'Yes, he had his gun'?

"Objection. Objection overruled.

"A. I was on trial for my life when I told you all that.

"Q. I think that is all Dudley. A. It's all right with me."

It is urged that permitting this sort of cross-examination was improper and contrary to law. In the case of *Hurley* v. *State, supra,* the court says:

"A party who calls a witness, and is taken by surprise by his unexpected, and unfavorable testimony, may interrogate him in respect to declarations and statements previously made by him, which are inconsistent with his testimony, for the purpose of refreshing his recollection, and inducing him to correct his testimony, or explain his apparent inconsistency; and for such purpose his previous declarations may be repeated to him, and he may be called upon to say whether they were made by him."

In the case at bar it is stated by the prosecutor that the testimony he was giving in the trial of Burl Rogers was different than that given at the trial of Dudley Adams upon which he had relied when he brought him from the penitentiary to testify on behalf of the state and that by reason thereof he was taken by surprise and that his present testimony was adverse to the contention of the state. We think the situation presented comes squarely within the *Hurley case, supra.*

It is urged that before this rule can be applied the witness must have stated some fact in evidence which was injurious to the party in whose behalf he was testifying and it is not sufficient that he merely made a statement different from that which the party had reason to and did believe he would make.

A perusal of the above questions and answers certainly satisfies this rule. If Adams testified on his trial that Daniels stated to Rogers, "Let's get a case of milk" and Rogers said, "Yes, we will get a case of milk," and on trial of Rogers, Adams testified that Rogers did not have "hardly anything to say, didn't say much of anything, just left it go by," such testimony at the time of trial of Rogers would not be as injurious to Rogers as the testimony given by Adams in his own trial wherein he testified that Rogers said, "Yes, we will get a case of milk." Such testimony of Adams if true indicated a conspiracy between these men to secure the milk. The other cross-examination has to do with the question as to whether Rogers had a gun. In the former trial Adams apparently testified that Rogers told him to go up to the wagon and that Rogers had a gun. He also admitted that he, Adams, said on his trial, "I knowed maybe if I didn't do what he wanted he would plug me and so I went up and a man throwed a milk bottle." The fact that Rogers did or did not have a gun would have some little bearing on the question of whether in entering into this conspiracy they intended if necessary to use force or violence to secure the milk as it is quite evident that Adams and Daniels each had a gun. Certainly the testimony attempted to be given by Adams on the trial of Rogers was to a certain degree injurious to the state as on Adams' trial he, Adams, testified that Rogers had a gun and on the trial of Rogers was attempting to give testimony more favorable to Rogers in this regard. There is authority also to the effect that the extent to

which one may cross-examine his own witness rests largely in the discretion of the trial court. See Underhill's Criminal Evidence (4 Ed.), 780, Section 398, and cases therein cited; and also the case of *Di Carlo* v. *United States,* 6 F. (2d), 364, 268 U. S., 706, 69 L. Ed., 1168, 45 S. Ct., 640, the seventh paragraph of the syllabus being as follows:

"Latitude allowed prosecution in examining its recalcitrant witness is wholly within discretion of trial judge, and questions may extend to cross-examination and inquiry whether witness has not at other times made contradictory statements, so that jury may gather truth from his whole conduct and bearing."

*Prescott* v. *Albrecht, Admx.,* 21 C. C. (N. S.), 198, 33 C. D., 314. There was no error in the court permitting this cross-examination of Adams by the state. There is nothing in the record to indicate that the prosecutor had any knowledge that Adams would, on the Rogers trial, testify differently than he had at his own trial.

Now it is urged that the verdict and judgment are against the weight of the evidence and contrary to law. As to the verdict being against the weight of the evidence, we are satisfied that taking into consideration the evidence as disclosed by the record, there can be no question but that Clarence Dickey was murdered; and that Dudley Adams fired the shot which resulted in his death. The jury so found and Adams is now serving a life sentence in the penitentiary for so doing. There is no doubt but that Rogers, Adams and Daniels entered into a conspiracy to take milk from this milk wagon on the morning in question. There can be no doubt but that Rogers' car was used in the transportation of Adams and Daniels and that Rogers drove the car and waited on Fawcett street a distance of about 75 feet from where the crime was committed and was there for the purpose of hauling the milk and also the

transportation of Adams and Daniels after securing the same although there is testimony that Rogers left with the car immediately on hearing the shots. However, this was too late to withdraw even though such was his intention at the time. While Rogers did not do the actual shooting he was a coconspirator and aided and abetted in the attempt to secure the milk and in that attempt the killing occurred. In the light of the evidence as disclosed by the record a jury question was presented as to whether Rogers was guilty of murder in the first degree in the attempt to perpetrate a robbery and there is ample evidence in the record to warrant the finding of the jury, beyond the existence of a reasonable doubt, that Rogers was guilty of the offense charged and the verdict of the jury is not against the manifest weight of the evidence.

Is the verdict contrary to law? In the bill of particulars furnished by the state it is charged that these three men entered into a conspiracy to rob the Dickey boys. It is urged by appellant that such was not the intent but simply to steal the milk. The court charged the jury:

"But if you do not find that it has been proved beyond a reasonable doubt that it was contemplated by defendant and his codefendants that force and violence would be used against the Dickeys or that they would put them in fear in order to steal the milk then a conspiracy to steal the milk would not be a conspiracy to rob or attempt to rob and defendants if they did not engage in a conspiracy to rob would not be guilty of murder in the first degree."

The court further charged:

"If you do not find that defendant conspired with his codefendants to rob or attempt to rob the said Dickeys of a case of milk or any milk then you cannot find defendant guilty of murder in the first degree."

We think this was a strong statement of the court

favorable to the defendant. However, it left the determination of that fact to the jury.

A conspiracy is a combination of two or more persons by some concerted action to accomplish some criminal or unlawful purpose and if one or 'more of the conspirators commit a crime in the furtherance of the conspiracy all of the conspirators are guilty of the crime so committed for the reason that the act of one of the conspirators in the furtherance of the conspiracy is the act of all and it is not necessary that the conspiracy be one to commit the identical offense charged in the indictment or even a similar one, it being enough that the offense charged in the indictment was one which might have been contemplated as the result of the conspiracy and which would be reasonably likely to be committed as a result of the conspiracy. Robbery is defined in this state as follows:

"Whoever, by force or violence, or by putting in fear, *steals* and takes from the person of another anything of value is guilty of robbery."

It is not necessary to constitute robbery that the taking be from the person of another, that is, actually severed from the person. It is enough if taken from the immediate control of the person, provided the property is taken by or through the use of force or violence or by putting in fear. To this effect see *Turner* v. *State,* 1 Ohio St., 422, 425; *Mitchell* v. *State,* 42 Ohio St., 383, 386.

These observations are equally applicable where one is charged with attempt to rob. It is clear that Adams and Daniels had guns with them, which is some evidence that they intended if necessary to use force or violence or intended to put the boys in fear and thus secure the milk, and the evidence further discloses that Daniels pointed the gun at one of the boys and demanded the milk. Certainly this is some evidence that there was an attempt to take the milk by putting the

boys in fear and an attempt to *steal* and take the milk by force or violence or by putting in fear constitutes an attempt to rob. Stealing by using force or violence or putting in fear constitutes robbery. Rogers was indicted for murder in the first degree in attempting to perpetrate a robbery. Section 12400, General Code, provides in part:

"Whoever, purposely, and either of deliberate and premeditated malice, or by means of poison, or in perpetrating or in attempting to perpetrate rape, arson, robbery or burglary, kills another is guilty of murder in the first degree * * *."

It is claimed that the court erred in a part of the charge when it stated to the jurors:

"The court charges you that a conspiracy is sufficiently shown if it is made to appear that the defendant Burl Rogers and his associates had a common purpose to commit an unlawful act though that unlawful act was dissimilar from the crime in fact committed, if the latter crime was one that might have been contemplated reasonably as likely to result from the attempt to commit the act intended."

We can discover no error in this part of the charge. It is apparent that appellant confuses the purpose of the conspiracy as he urges it to be to steal when the offense charged in the indictment is murder in the first degree in attempting to perpetrate a robbery. A conspiracy is not the offense charged.

In the case of *Goins* v. *State,* 46 Ohio St., 457, 21 N. E., 476, paragraph 4 of the syllabus reads as follows:

"4. (a) On the trial of one of several defendants jointly indicted for an offense, the declarations of a co-defendant, made in the absence of the defendant on trial, in furtherance of the common purpose, are admissible when a *prima facie* case of conspiracy has been made.

"(*b*) To authorize the admission of such evidence, an express averment in the indictment, of the fact of a conspiracy, is not necessary.

"(*c*) Nor need the conspiracy be one to commit the identical offense charged in the indictment, or even a similar one; it being enough that the offense charged in the indictment was one which might have been contemplated as a result of the conspiracy."

In the case of *State* v. *Doty,* 94 Ohio St., 258, 113 N. E., 811, which is a case quite similar to the case at bar wherein the actual user of the revolver in that case pleaded guilty to murder and the court fixed the degree of his crime as second degree murder and he was confined in the Ohio penitentiary but returned and testified as a witness for the state, the court said:

"Where the state has indicted a defendant as a principal offender for murder in the first degree, but on the trial prosecutes him only as an aider and abettor and lodges its entire case upon proof of a conspiracy to commit an unlawful act by the use of deadly weapons or force and violence of such character as would reasonably be expected to cause the death of another, it is error to charge the jury that if it finds that the shot was fired by the principal offender without the knowledge, connivance or assent of the defendant the jury must acquit.

"Where only such unlawful act was contemplated in the original conspiracy, although not identical with or similar to the criminal act charged, if the conspired unlawful act and the manner of its performance would be reasonably likely to produce death, each conspirator is equally guilty with the principal offender, as an aider and abettor in the homicide, although such aider and abettor was neither present nor had knowledge of the physical killing or of the weapon used."

The verdict of the jury is not in this regard contrary to law.

Now it is urged that the court should have instructed and submitted to the jury that it might find Rogers guilty of the lesser offenses of murder in the second degree or manslaughter.

The court submitted three forms of verdict, a verdict of murder in the first degree as charged in the indictment, murder in the first degree with recommendation of mercy and a verdict of not guilty, and stated to the jury that in this case a verdict of guilty of murder in the second degree or manslaughter could not be returned. Was the court in error in this regard? Rogers was charged in the indictment with murder in the first degree in that he unlawfully, purposely and while attempting to perpetrate a robbery killed Clarence Dickey. Rogers did not fire the shot that killed Clarence Dickey. A perusal of the record satisfies this court that Rogers was an aider and abettor and coconspirator to the killing. Adams was the principal offender as the evidence discloses that he, Adams, was the one who fired the shot that killed the Dickey boy. The jury in his case so found and Adams is now incarcerated for life in the Ohio penitentiary. Section 13448-2, General Code, provides:

"The jury may find the defendant not guilty of the offense charged, but guilty of an attempt to commit it if such attempt is an offense at law. When the indictment or information charges an offense, including different degrees, or if other offenses are included within the offense charged, the jury may find the defendant not guilty of the degree charged but guilty of an inferior degree thereof or lesser included offense."

The court in the case of *Malone* v. *State,* 130 Ohio St., 443, 200 N. E., 473, held:

"Where one is indicted and tried for murder in the attempted perpetration of robbery under Section 12400, General Code, no instruction on any lesser grade of homicide than murder in the first degree is requisite

or proper when evidence to support the same is lacking. (*Bandy* v. *State,* 102 Ohio St., 384, approved and followed.)''

On page 449 of the opinion in the *Malone case* it is stated:

'' 'Where an indictment charges a defendant with murder under this part of the statute, and no other class of homicide is charged, and the evidence tends to prove no other grade of crime, no instruction should be given to the jury concerning murder in the second degree or manslaughter. Hence, the accused should be convicted of the extreme offense or none at all. However, it has generally been held that, where there is evidence to support a lesser charge, the accused might rightfully be convicted of the lower offense and the court would be justified in charging upon it.' ''

This brings us to an examination of the evidence in the instant case. There is evidence in the record to the effect that Clinton Daniels, one of the conspirators, said in the presence of Rogers and Adams he was ''going to stick them up''—that is the Dickey boys—and pursuant to that intention the three proceeded to where the milk deliveries were being made. Daniels and Adams did hold these boys up and in so doing Clarence Dickey was killed. Not much doubt can be entertained but that Adams purposely killed the Dickey boy. He used a deadly weapon and shot Dickey in the abdomen. Under the offense charged no deliberation or premeditation was necessary. If Adams purposely killed the Dickey boy in this holdup to secure milk, he was guilty of the offense of murder in the first degree and no lesser offense and the jury so found, and Rogers was an aider and abettor and coconspirator standing in this regard in the shoes of Adams. Adams and Rogers were guilty of murder in the first degree or guilty of no offense. They were charged with no other offense. The jury found Rogers guilty of murder in the first de-

gree with recommendation of mercy, the same penalty meted out to Adams, the principal offender, and if Adams purposely killed Clarence Dickey in attempting to rob the boys of the milk in their custody and control, Rogers aided and abetted and conspired to commit that crime and none other. There is no evidence in this record justifying or calling for a charge on the submission of forms of verdict including second degree and manslaughter.

In the case of *Dresback* v. *State,* 38 Ohio St., 365, the second paragraph of the syllabus is as follows:

"On the trial of an indictment for murder in the first degree, charging the accused with purposely killing another by administering poison, the evidence tending to show no other grade of offense, it is error to charge the jury to the effect that if they find the accused guilty their duty will be fulfilled by convicting of murder in the first or second degree, or manslaughter. And where the verdict is returned for a lower grade of homicide than murder in the first degree, a new trial should be granted, where it appears from the evidence that a verdict of acquittal might have been rendered had the jury been properly instructed."

It is apparent from the holding of the court in this case that if there was an absence of evidence tending to show no other grade of offense than the one charged it was error in charging second degree murder and in that case the court reversed the finding of the jury that found accused was guilty of murder in the second degree for the reason that if the jury had been properly charged under the evidence, the defendant might have been acquitted entirely of the charge.

In the light of the record before us the court was not in error when it refused to charge and submit to the jury forms of verdicts of murder in the second degree and manslaughter. We have considered all the errors urged in the brief of appellant and have reached the

conclusion that there was no error prejudicial to the accused committed in the trial of the case and reaching this conclusion the verdict and judgment of the lower court is affirmed.

*Judgment affirmed.*

NICHOLS, P. J., concurs.

BENNETT, J., concurs in the judgment.