**[This opinion has been published in *Ohio Official Reports* at 73 Ohio St.3d 450.]**

THE STATE OF OHIO, APPELLEE, *v*. JOSEPH, APPELLANT.

[Cite as *State v. Joseph*, 1995-Ohio-288.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 94-372—Submitted May 10, 1995—Decided August 30, 1995.)

APPEAL from the Court of Appeals for Allen County, No. 1-91-11.

_____

{¶ 1} During the fall of 1989, defendant-appellant, Richard E. Joseph, began dating Cara M. Wireman. They began to date steadily until sometime in February 1990. Cara decided to end the relationship because she did not like the way appellant treated her and she attended her senior prom with someone else. In April, Cara started dating the victim, Ryan Young, a student at the same high school. Ryan and appellant knew each other from playing together on the school football team.

{¶ 2} Cara testified that appellant was jealous of Ryan's relationship with her. Appellant wanted her to stop seeing Ryan so they could renew their relationship. This was evidenced by several letters appellant wrote to Cara indicating his jealousy and desire to continue dating Cara. In one letter, he indicated he had been secretly watching Cara and Ryan together for three hours. Cara knew that martial arts played a big part in appellant's life and she had previously seen him with guns and knives.

{¶ 3} On Monday, June 25, 1990, the day prior to the kidnapping, Cara and Ryan observed appellant driving around in the area where Cara and Ryan both lived. Cara indicated she did not normally see appellant driving in this area.

{¶ 4} On Tuesday, June 26, 1990, Ryan asked his mother if he could go to Cara's house, and he left around seven o'clock that evening driving his father's 1981 Oldsmobile. Ryan's mother received a telephone call from Ryan about 10:30

p.m. that evening and, during that conversation, she told him he could stay and finish watching the movie and then come straight home.

{¶ 5} Cara's next-door neighbor, Rose Fetter, was outside walking her dog at about 11:15 p.m. that night, when she observed a clean white car driving slowly down Thayer Road. There were two occupants in the car. Fetter indicated she first saw the car being driven north up Thayer Road. About ten minutes later she observed the car heading south on Thayer Road. The car pulled into a dirt driveway leading to property owned by a local kennel club and parked for a few minutes. Just prior to Fetter's going into her home she observed the car back out of the driveway and head north for a second time. Fetter testified she and her husband took care of the property for the kennel club and that she mowed around the driveway earlier in the day and did not observe any tire tracks at that time. However, the next morning she noticed there were tire tracks in the driveway.

{¶ 6} Ryan, Cara, and Cara's friend, Michelle Rumer, were at the same time watching the movie at Cara's house. The movie ended at approximately 11:30 p.m., at which time Michelle left to go home. Ryan stayed about fifteen or twenty minutes after Michelle left. Ryan and Cara walked out of Cara's house and into the driveway. As Ryan got into the car, Cara heard Ryan remark, "That looks like the White Cutlass that Dick [appellant] drives." Cara responded, "I doubt that. He wouldn't be out here." Ryan said, "I'm pretty sure that was him."

{¶ 7} Ryan was wearing a baseball hat turned backwards on his head that night. Cara saw Ryan back out onto Thayer Road into a position that would permit him to drive north on Thayer. Just as Ryan backed onto the roadway, she saw the dome light in his car illuminate and heard a voice when the dome light came on. Cara also saw Ryan's head turn toward the passenger side door.

{¶ 8} Cara went back into the house and watched television for about fifteen minutes. She decided to go to bed, so she went to shut the front door and saw the tail end of a white car drive by slowly heading south on Thayer Road. She saw the

2

tail lights on the car and heard the breaks squeak. The subject car repeatedly turned around after passing Cara's residence and passed in front of her house approximately ten to twelve times. Cara testified the car matched the description of the car belonging to Bill Forest, a friend of appellant. Cara testified appellant and Jose Bulerin, appellant's friend and roommate, often borrowed Forest's car. Cara became upset and called Michelle concerning the car that had passed in front of her house. At about 12:35 a.m., Cara called the residence shared by appellant and Bulerin. She spoke with appellant's cousin, April Joseph, who testified neither appellant nor Bulerin was home to answer the call. Cara again called Michelle and talked for a while before calling the appellant's residence a second time at 1:00 a.m. Appellant and Bulerin still had not returned home.

{¶ 9} Cara went to sleep and was awakened by a phone call from Ryan's mother, Sharon Young, at approximately 4:00 a.m. that morning. At about that time, Ryan's father, Rick Young, awoke and discovered that neither his son nor the car Ryan had been driving was home. The Youngs drove down Thayer Road toward Cara's house in search of their son. They found the 1981 Oldsmobile Cutlass Ryan had been driving abandoned just north of the bridge on Thayer Road. Rick entered the car and nothing apparently was out of place. The keys were still in the ignition and the car was still in gear. There were no indications of a robbery, as Ryan's wallet and money were, respectively, left on the seat and console tray of the car. A wet spot and char marks were found on the passenger seat of the car. The seat had not been wet or dirty the day before. Inspector William Dailey took a material sample of a burnt log located across the road opposite from Cara's house on the morning of June 27, 1990. The inspector observed that the vegetation there was trampled down such that it led him to believe that someone may have been sitting in that area. The vegetation still had its color and the breaks in the leaves appeared to be fresh. He also took a sample of the blackened stain area on the front

seat of Ryan's car for purposes of comparison with the burned log. Chemical analysis performed later revealed that the samples were consistent with one another.

{¶ 10} The sheriff's department was notified and a search began. After talking with Cara, Deputy Gene King of the Allen County Sheriff's Office proceeded to appellant's residence to question him concerning Ryan's disappearance. King arrived at appellant's residence at approximately 5:10 a.m. on the morning Ryan was discovered missing and observed a white Cutlass in the driveway. King testified that the hood and radiator of the car were warm to the touch. There was also a dirty hand print on the trunk lid of the vehicle.

{¶ 11} King spoke with appellant and Bulerin. Appellant was hesitant to respond to questioning, as he persistently stared at the ground and his answers were invariably inaudible. The deputy testified that in spite of the early morning hour, appellant did not appear to have been asleep. The deputy also noticed fresh blisters on appellant's right hand.

{¶ 12} Appellant was questioned both later that morning and about a week afterwards by law enforcement officers. Appellant disclaimed any knowledge of Ryan's disappearance. Appellant told the sheriff's detectives that on the day of the disappearance he reported to work at Frank's Car Wash. He then left with Forest to go to work at Indian Lake in Logan County. Forest testified that they had been building a deck in order to install a hot tub adjacent to a house. Appellant, Bulerin, and Forest were using Visqueen to cover up the deck to protect against the rain.

{¶ 13} Appellant told detectives that the trio worked until about 6:30 p.m. before starting back to Lima to attend karate class. According to Forest, the karate class was taught by Bulerin with appellant helping out as a co-instructor. Appellant and Bulerin then left karate class in Forest's car, the white Cutlass. Forest testified he left class with his girlfriend and did not see either appellant or Bulerin again that night. Appellant and Bulerin went home, got cleaned up, and then left to get something to eat. Appellant stated that, afterwards, the pair drove around in

4

Forest's car for several hours before returning home and going to bed at approximately 2:30 a.m. Appellant also stated that the brakes on Forest's car did squeak on that night.

{¶ 14} Although Forest's car had new tires on it, Bulerin took Forest's car and changed the tires the day following Ryan's disappearance. Three of the tires that had been on Forest's car the night of Ryan's abduction were recovered by Detective Sergeant James Ketchum, who testified the tread pattern on one of the tires was similar to the tire prints found in the driveway to the kennel club located on Thayer Road.

{¶ 15} Forest had kept a knife clipped to the sun visor in his car that was identical to another knife owned by a friend of his. The knife of Forest's friend was subsequently turned over to Lieutenant Van Horn by Forest for the investigation. Forest's knife had been in Forest's automobile on June 26, 1990; however, it had not been seen since. Forest testified that appellant and Bulerin had used his car, had access to it, and traveled in it together frequently. Appellant and Bulerin also kept articles in his car, and he had observed a piece of material described as plastic, vinyl, or Visqueen and a shovel in his trunk. Forest had observed the same shovel before at appellant's house. Forest also testified that he had watched a lot of movies with appellant and Bulerin, many of which dealt with the martial arts. He also knew that appellant had a black mask.

{¶ 16} Monte Stinebuck worked at Frank's Auto Wash with appellant, Forest, and Bulerin. He testified that he saw appellant and Bulerin on Thursday, June 28, 1990, and it was rainy that day. A discussion ensued regarding hauling some trash from the car wash and taking it to Joseph's Sand and Gravel Pit. They had never taken trash there before and the truck was loaded a quarter full.

{¶ 17} Throughout the week following Ryan's disappearance, an extensive search was conducted. On July 4, 1990, the Allen County Sheriff's Department acted upon the information provided by Stinebuck and instituted a search at

Joseph's Sand and Gravel Pit located in Auglaize County and owned by Joseph's grandparents. Mary Joseph, appellant's grandmother, testified that she owned the sand and gravel pit and that appellant was familiar with it, as he had spent a lot of time there growing up.

{¶ 18} Ryan's body was discovered in a shallow grave. The body was wrapped in Visqueen, the jagged edge of which was matched positively with Visqueen recovered from the job site at Indian Lake where appellant had been working. Under the body, a black ninja mask was recovered. An autopsy revealed that Ryan had superficial lacerations in the area of the throat. Further, Ryan had been stabbed two times in the back--one to the right flank and one at the base of the skull.

{¶ 19} Appellant and Bulerin were jointly indicted for purposely causing the death of Ryan Young while committing or while fleeing immediately after committing kidnapping. The indictment also contained a death-penalty specification based upon R.C. 2929.04(A)(7). Appellant and Bulerin were tried separately. Appellant's case was tried to a jury which found him guilty of aggravated murder and of the specification thereto. The penalty phase of the trial began on January 28, 1991. After deliberations, the jury found the aggravating circumstance surrounding the murder outweighed the mitigating factors beyond a reasonable doubt. The jury recommended a sentence of death. After independent deliberations pursuant to R.C. 2929.03(D)(3), the trial court accepted this recommendation and imposed a sentence of death upon appellant.

{¶ 20} The court of appeals affirmed the conviction and the sentence of death.

{¶ 21} This matter is now before this court as a matter of right.

———————————

*David E. Bowers*, Allen County Prosecuting Attorney, *Gary R. Herman* and *Jana E. Emerick*, Assistant Prosecuting Attorneys; and *Brad C. Roush*, for appellee.

*David H. Bodiker*, Ohio Public Defender, *Kathleen A. McGarry* and *J. Joseph Bodine*, Assistant Public Defenders, for appellant.

———————————

**FRANCIS E. SWEENEY, SR., J.**

{¶ 22} In a line of cases beginning with *State v. Poindexter* (1988), 36 Ohio St.3d 263, 520 N.E.2d 568, we have adopted the view that when we review death-penalty cases, we are not required to address all propositions of law in opinion form. *State v. Simko* (1994), 71 Ohio St.3d 483, 644 N.E.2d 345; *State v. Scudder* (1994), 71 Ohio St.3d 263, 643 N.E.2d 524; *State v. Hawkins* (1993), 66 Ohio St.3d 339, 612 N.E.2d 1227. Accordingly, we will not discuss the merits of many of appellant's propositions of law which have been resolved in other cases or which have not been properly preserved. However, while this opinion does not separately address each of the thirty-six propositions of law (see Appendix), we have fully reviewed the record and passed upon each proposition prior to reaching our decision. We have also independently assessed the evidence relating to the death sentence, balanced the aggravating circumstance against the mitigating factors, and reviewed the proportionality of the sentence to sentences imposed in similar cases. As a result, we affirm the conviction and death sentence.

I

INDICTMENT

{¶ 23} In appellant's first proposition of law, he asserts that the indictment in this case did not specify a proper aggravating circumstance, without which a capital offense is not charged. Specifically, appellant argues that the error resulted in the trial court's lacking subject-matter jurisdiction over the case and, hence, also lacking the power to sentence the appellant to death. For the following reasons, we find that this argument is without merit.

{¶ 24} Initially, we note that appellant never challenged the sufficiency of the indictment at any time before or during his trial. An appellate court need not

consider an error which was not called to the attention of the trial court at a time when such error could have been avoided or corrected by the trial court. *State v. Williams* (1977), 51 Ohio St.2d 112, 117, 5 O.O.3d 98, 101, 364 N.E.2d 1364, 1367. As a result, such error is waived absent plain error. *State v. Moreland* (1990), 50 Ohio St.3d 58, 62, 552 N.E.2d 894, 899. Plain error does not exist unless, but for the error, the outcome at trial would have been different. *Id.*

{¶ 25} The grand jury issued a joint indictment against appellant and Bulerin. The indictment charged that the pair jointly and purposely caused the death of Ryan Young while committing or fleeing immediately after committing kidnapping. The indictment also contained a death-penalty specification based upon R.C. 2929.04(A)(7). The specification as stated in the indictment reads:

"The Grand Jurors further find and specify that the offense was committed while the offenders were committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, and the offenders were principal offenders in the commission of the kidnapping in violation of the Ohio Revised Code, Section 2903.01(B) ***."

{¶ 26} In order to correspond with the statutory language of R.C. 2929.04(A)(7), the last part of the specification should have indicated the offenders were the principal offenders in the commission of the aggravated murder, and not merely the kidnapping. However, while the indictment does not expressly correspond with the statutory language of R.C. 2929.04(A)(7), we find that this error does not render the indictment invalid here since the record demonstrates that appellant had sufficient notice that he was being tried as a principal offender in the commission of the aggravated murder of Ryan Young while committing kidnapping.

{¶ 27} Former Crim.R. 7(B) provided[1] that the indictment "*** shall contain a statement that the accused has committed some public offense therein specified. Such statement may be made in ordinary and concise language without any technical averments or any allegations not essential to be proved. It may be in the words of the applicable section of the statute as long as the words of that statute charge an offense, or in any words sufficient to give the accused notice of all the elements of the offense with which he is charged ***."

{¶ 28} Thus, the indictment must adequately inform the defendant of the charge against him. In the present case, the indictment adequately charged appellant with the crime of aggravated murder, as it set forth the essential elements charging appellant with the offense of aggravated murder in violation of R.C. 2903.01(B). This indictment provided appellant with sufficient and adequate notice of the charge against him and the death-penalty specification alleged. Accordingly, the trial court had subject-matter jurisdiction over the appellant, as the indictment adequately charged appellant with the crime of aggravated murder.

{¶ 29} The penalty for aggravated murder is life imprisonment or death. R.C. 2929.02. If the state desires to seek the death penalty for a defendant who commits aggravated murder, the indictment charging the offense must contain at least one of eight specifications enumerated in R.C. 2929.04(A)(1) through (8). R.C. 2929.04(A) provides: "Imposition of the death penalty is precluded, unless one or more of the following is specified in the indictment or the count of the indictment pursuant to section 2941.14 of the Revised Code and proved beyond a reasonable doubt." That section then sets out eight different aggravating circumstances.

{¶ 30} The form of the specification is governed by R.C. 2941.14(C), which requires that the aggravating circumstance "may be stated in the words of the

---

1. The relevant language of current Crim.R. 7(B) is essentially the same as that in the former provision.

subdivision in which it appears, or in words sufficient to give the accused notice of the same." Thus, the language of the statute clearly provides that the specification is sufficient if the accused knows which subsection, or which aggravating circumstance of the eight listed in R.C. 2929.04(A) has been alleged.

{¶ 31} While the specification in the present case contained a technical error, we cannot find that this error rendered the indictment invalid, as the correct language of the specification was clearly ascertainable to appellant. The indictment's aggravated-felony-murder count and specification recited an obvious and undeniable reference to R.C. 2929.04(A)(7) (the felony murder specification) as the capital specification pursuant to R.C. 2901.03(B) (aggravated-felony murder). The indictment informed appellant of all elements comprising the capital offense of aggravated murder under R.C. 2901.03(B), as the exact language of that section containing all the elements for that offense was correctly recited in the single count of the indictment. Following the count set forth in the indictment and pursuant to R.C. 2941.14, a capital specification was included, which stated verbatim the relevant language of R.C. 2929.04(A)(7), except for the substitutional error in the last word of the specification. However, appellant certainly had sufficient notice from the wording of the specification that the aggravating circumstance set forth in R.C. 2929.04(A)(7) was being alleged. In fact, appellant, his attorneys, the prosecutor, and the trial judge treated the indictment as valid at all stages of the proceedings, never noticing any flaw in the indictment. Thus, the record demonstrates that the wording of the specification was sufficient to give appellant notice that the state was required to prove that he was a principal offender in the commission of the aggravated murder of Ryan Young pursuant to the specification contained in R.C. 2929.04(A)(7).

{¶ 32} Furthermore, appellant has not shown that he was prejudiced in the defense of his case from this substitutional error or that he would have proceeded

differently had this error been corrected. Indeed, had the error been discovered, it was properly subject to amendment. Crim.R. 7(D).

{¶ 33} Moreover, the jury verdict form correctly phrased the specification. The trial court read to the jury this verdict form, which contained the properly worded specification. The jury then signed each of their names to this verdict form, which correctly phrased the specification to them for the jury's consideration.

{¶ 34} In conclusion, we find that the flawed indictment sufficiently notified appellant of the charge against him and the death-penalty specification. Accordingly, appellant's proposition of law number one is without merit.

II

GUILT PHASE

*Immunity of William Forest*

{¶ 35} In proposition of law number two, the appellant asserts that he was denied a fair trial due to the appellee's failure to disclose exculpatory information pursuant to Crim.R. 16(B)(1)(f). Specifically, appellant argues that the trial court erred when it denied the appellant's motion for mistrial when it was discovered during trial that William Forest, a witness for the state, had been granted immunity and that the grant of immunity had not been disclosed to the defense. Appellant argues that voir dire and opening statement would have been conducted differently had the defense known of the immunity.

{¶ 36} Crim.R. 16(B)(1)(f) provides, in relevant part: "Upon motion of the defendant before trial the court shall order the prosecuting attorney to disclose to counsel for the defendant all evidence, known or which may become known to the prosecuting attorney, favorable to the defendant and material either to guilt or punishment." In the present case, the state's granting immunity to Forest affected his credibility as a prosecution witness. Furthermore, Forest was a crucial witness to the prosecution's case. Thus, we agree with appellant that this information was properly discoverable.

**{¶ 37}** Prosecutorial violations of Crim.R. 16 are reversible only when there is a showing that (1) the prosecution's failure to disclose was a willful violation of the rule, (2) foreknowledge of the information would have benefited the accused in the preparation of his defense, and (3) the accused suffered some prejudicial effect. *State v. Parson* (1983), 6 Ohio St.3d 442,445, 6 OBR 485, 488, 453 N.E.2d 689, 692. See, also, *State v. Moore* (1988), 40 Ohio St.3d 63, 66, 531 N.E.2d 691, 694-695. In the present case, there is no indication that the violation was willful. Furthermore, there is nothing in the record to indicate that had the fact of immunity or even the substance of Forest's testimony been disclosed prior to trial, the result of the proceeding would have been different. Moreover, while the evidence was not disclosed to the defense prior to trial, it was disclosed during trial. The record reflects that the trial court took many remedial measures at that time to ensure the fairness of the proceedings, including notifying the jury of the immunity upon the defense's cross-examination of Forest and, at the end of trial, admonishing the jury that the credibility of a witness to whom immunity had been granted must be examined with greater scrutiny. Thus, since there is no evidence that appellant suffered any prejudice from the initial nondisclosure of the information, proposition of law number two is without merit.

*Sufficiency of Evidence*

**{¶ 38}** Appellant was convicted of aggravated murder (R.C. 2903.01), which included a death specification for kidnapping, and was found to be the principal offender in the commission of the aggravated murder. In proposition of law number eleven, appellant contends that the conviction was based on insufficient evidence. For the following reasons, this argument is without merit.

**{¶ 39}** "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is

12

whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.

{¶ 40} The record demonstrates that appellant was jealous of Ryan's relationship with Cara Wireman. In one letter to his ex-girlfriend Cara, appellant admitted that he had been secretly watching Cara and Ryan. Appellant also told Cara that he wanted her to stop seeing Ryan so that they could renew their relationship. Thus, appellant had a motive to kill the victim. On Tuesday, June 26, just prior to Ryan's abduction, the white Cutlass often driven by appellant was seen near Cara's home on Thayer Road as Ryan was about to leave. Appellant later admitted that he and Bulerin were driving around in Forest's white Cutlass on that night until about 2:30 a.m. Cara's neighbor, Rose Fetter, observed a white car with two occupants in it drive up and down Thayer Road at about 11:15 p.m. that night. Cara observed the car which matched the description of Forest's car pass her home ten to twelve times just after Ryan left. The vegetation across from Cara's home was found to be trampled down as if someone had been recently sitting in the area. Ryan's body was found buried on property owned by appellant's grandparents and on land with which appellant was familiar. The body was wrapped in Visqueen which matched Visqueen recovered from the job site at Indian Lake where appellant had been working. Forest stated that appellant had a black mask, and a black ninja mask was found under the body of the victim. Furthermore, Ryan suffered two stab wounds, either of which could have been fatal, and the knife always kept in the car was missing the morning of the disappearance.

{¶ 41} Based on the above and all the other evidence in the record, we find that there was sufficient evidence adduced at trial to convince the trier of fact that appellant was guilty beyond a reasonable doubt of the kidnapping and murder of Ryan Young and that he was the principal offender in the commission of the

aggravated murder. While the evidence establishing appellant as a principal offender is circumstantial, circumstantial and direct evidence inherently possess the same probative value and, therefore, should be subject to the same standard of proof. See Jenks at paragraph one of the syllabus. The jury signed the verdict form containing the R.C. 2929.04(A)(7) specification that appellant was the principal offender in the commission of the aggravated murder. We will not disturb this determination, as sufficient evidence existed for a rational trier of fact to find that appellant was the principal offender, *i.e.*, actual killer, in the aggravated murder of Ryan Young beyond a reasonable doubt. See *State v. Jenks, supra*; *State v. Green* (1993), 66 Ohio St.3d 141, 609 N.E.2d 1253. Accordingly, this argument is without merit.

*Gruesome Photographs*

{¶ 42} In proposition of law number twenty, appellant argues that the prosecution's introduction of a videotape of the crime scene, photographs of the crime scene, and slides of the autopsy were so gruesome and repetitive that any probative value was outweighed by unfair prejudice to the accused. This argument is without merit.

{¶ 43} "Properly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative to testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number." *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus. The trial court has broad discretion in the admission of evidence and unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby, an appellate court should not disturb the decision of the trial court. *Id.* at 265, 15 OBR at 401, 473 N.E.2d at 791.

{¶ 44} In the present case, six photographs of the crime scene were admitted into evidence, all showing different views of the body. These photographs were relevant, as they were used, in part, to corroborate the testimony of Inspector Daily concerning wounds inflicted on the victim. A videotape of the crime scene was taken, but the camera stopped working before the victim's body was unearthed. Thus, this videotape did not unduly prejudice appellant. In addition, nine autopsy slides were entered into evidence to corroborate the expert testimony of Dr. Amy Martin of the Hamilton County Coroner's Office. While some of these photos are gruesome, their probative value outweighed any danger of material prejudice to appellant. Accordingly, we find that the trial court did not abuse its discretion.

III

PENALTY PHASE

*Jury Instructions*

{¶ 45} In proposition of law number seven, appellant argues that the cumulative effect of alleged erroneous instructions to the jury requires reversal of the death sentence. For the following reasons, this argument is without merit.

{¶ 46} First, appellant asserts that his sentence must be reversed because an imperfect specification was read to the jury at the beginning of the penalty phase. The trial court instructed the jury that the state charges in the specification that "'*** the offenders were the principal offenders in the commission of the kidnapping.'" Initially, we note that appellant did not object to this instruction at trial and, thus, it is waived absent plain error. *State v. Moreland*, *supra*; Crim.R. 52(B).

{¶ 47} In the present case, this error was cured, as the trial court subsequently read to the jury the correctly worded specification. The court began by stating: "It is now my duty to instruct you on the law which applies to this proceeding." The court then stated: "In the single count the aggravating circumstance is precisely set out in the specification. Completely stated, it is as

follows: ***." The trial court subsequently read the correctly worded specification to the jury. This correctly worded instruction was read immediately before the jury began its penalty deliberations. Thus, the jury was informed of the proper phrasing of the specification prior to undergoing its deliberations. Accordingly, we cannot find that the trial court's reading of the imperfect specification at the beginning of the penalty phase rises to the level of plain error, especially in light of the fact that the jury had already signed the verdict form which contained the correctly worded specification during the guilt phase.

{¶ 48} Second, appellant argues that the trial court placed the burden on appellant to prove that death was not the appropriate penalty when, in its preliminary instruction, the trial court instructed: "*** the defendant will have the opportunity to offer evidence of mitigating factors to attempt to offset the affect [*sic*] of the aggravating circumstance as set forth above and as found by you during the guilt determination phase." This instruction is not an incorrect statement of the law. See R.C. 2929.03(D)(2). Further, the jury was also instructed as follows: "[Y]ou must determine whether the State of Ohio has proved beyond a reasonable doubt that the aggravating circumstance of which the defendant is guilty outweighs the mitigating factors." Thus, it is clear from a review of the instructions as a whole that the state of Ohio was not relieved of its burden of proof. This argument is meritless.

{¶ 49} Third, appellant argues that the trial court improperly used the word "blame" when it instructed the jury that "[m]itigating factors *** may be considered by you as *** reducing the degree of the defendant's blame." However, this argument is without merit, as use of the word "blame" alone did not constitute error where, as here, the jury instructions, taken as a whole, clearly indicate that the penalty phase was for punishment determination and not for assessment of culpability. See *State v. Lawrence* (1989), 44 Ohio St.3d 24, 29, 541 N.E.2d 451, 457.

**{¶ 50}** In conclusion, this court has reviewed all of appellant's arguments regarding erroneous jury instructions, and we have found that they do not amount to error either individually or collectively. Accordingly, proposition of law number seven is without merit.

*Independent Review*

**{¶ 51}** In appellant's proposition of law number three, appellant argues that the aggravating circumstance here does not outweigh the mitigating factors. For the following reasons, we find that the trial judge properly determined that the aggravating circumstance outweighs the mitigating evidence presented.

**{¶ 52}** Pursuant to R.C. 2929.05(A), we must independently determine whether the aggravating circumstance outweighs any mitigating factors that have been established and whether the sentence of death is appropriate.

**{¶ 53}** The sole statutory aggravating circumstance in this case is that appellant murdered the victim while committing kidnapping. See R.C. 2929.04(A)(7).

**{¶ 54}** Against the aggravating circumstance we weigh all mitigating factors drawn from the nature and circumstances of the offense; the history, background and character of appellant, and any other factors listed in R.C. 2929.04(B)(1) through (7) which exist in this case. The statutory mitigating factors include the youth of the offender (age nineteen at the time of the murder) and his lack of a prior criminal history or delinquency adjudications. The mitigating factors of R.C. 2929.04(B)(1),(2),(3), and (6) were not established. While appellant went to live with co-defendant Bulerin at the age of sixteen, we find no evidence to establish a showing of duress, coercion, or strong provocation impacting on the appellant sufficient to establish this as a mitigating factor. Also, appellant was not shown to lack the substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

{¶ 55} Under R.C. 2929.04(B)(7), the catchall category, appellant claims as mitigating factors that he had a difficult homelife and a learning disability.

{¶ 56} When appellant was young his father spent time in prison and his parents divorced. His mother remarried but his stepfather was abusive to him. This evidence is entitled to little or no weight as a mitigating factor. See *State v. Seiber* (1990), 56 Ohio St.3d 4, 9, 564 N.E.2d 408, 415-416.

{¶ 57} Appellant's learning disability involved a difficulty with reading and writing in school, but appellant had a normal I.Q. and was permitted to graduate with his class. The psychologist, Dr. Wayne Graves, testified that appellant was shy and nonverbal and internalized his feelings and emotions. Dr. Graves also indicated that appellant had a good potential for rehabilitation. This evidence is subject to little or no weight as a mitigating factor. See *State v. Scudder*, *supra*, 71 Ohio St.3d at 275, 643 N.E.2d at 534.

{¶ 58} The facts and circumstances of this case are that appellant, motivated by jealousy, lay in wait outside his former girlfriend's residence, where the sixteen-year-old victim was then kidnapped after visiting the girlfriend. The victim was then subjected to cuts across his throat and fatally stabbed twice with a knife. Thus, the evidence is compelling that appellant committed kidnapping during the murder of Ryan Young.

{¶ 59} In weighing the aggravating circumstance against the mitigating factors, we conclude that the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt.

*Proportionality Review*

{¶ 60} In proposition of law number four, appellant argues that the sentence of death is not appropriate in this case. In carrying out the analysis of whether the sentence of death is appropriate, we find that the sentence of death in this case is neither excessive nor disproportionate, but is appropriate, when compared with other felony-murder cases which involved kidnapping. See *State v. Simko* (1994),

71 Ohio St.3d 483, 644 N.E.2d 345; *State v. Fox* (1994), 69 Ohio St.3d 183, 631 N.E.2d 124; *State v. Spirko* (1991), 59 Ohio St.3d 1, 570 N.E.2d 229; *State v. Roe* (1989), 41 Ohio St.3d 18, 535 N.E.2d 1351.

{¶ 61} Therefore, we affirm the judgment of the court of appeals.

*Judgment affirmed.*

DOUGLAS, RESNICK and PFEIFER, JJ., concur.

MOYER, C.J., DESHLER and COOK, JJ., concur in part and dissen tin part.

DANA A. DESHLER, JR., J., of the Tenth Appellate District, sitting for WRIGHT, J.

---

**MOYER, C.J., dissenting in part and concurring in part.**

{¶ 62} Richard Joseph was convicted of the crime of aggravated murder beyond a reasonable doubt. No prejudicial error occurred in the guilt phase of his trial. I partially dissent, however, because I am unable to reach a similar conclusion with respect to the death penalty specification. In my view, the indictment issued against Joseph by the grand jury did not contain a specification upon which a death sentence could legally be based. I similarly do not find evidence in this record sufficient to support a finding beyond a reasonable doubt that Joseph was a "principal offender" in the death of Ryan Young, as that term has consistently been interpreted by this court. I therefore dissent from the majority's affirmation of Joseph's death sentence. I would remand this case to the trial court with instructions that Joseph be resentenced, in accordance with R.C. 2929.03(A),[2] to life imprisonment with parole eligibility after serving twenty years of imprisonment.

---

2. R.C. 2929.03 provides in part:

"(A) If the indictment or count in the indictment charging aggravated murder does not contain one or more specifications of aggravating circumstances listed in division (A) of section 2929.04 of the Revised Code, then, following a verdict of guilty of the charge of aggravated murder, the trial court shall impose a sentence of life imprisonment with parole eligibility after serving twenty years of imprisonment on the offender."

**{¶ 63}** The state concedes that the specification included in the indictment was flawed. The indictment[3] charged Joseph and Jose Bulerin (who was tried separately and sentenced to twenty years to life imprisonment) with aggravated murder (R.C. 2903.01[B]). The specification charged both Joseph and Bulerin as principal offenders in the commission of the *kidnapping* of Young rather than the principal offenders in the commission of Young's *aggravated murder*. However, where prior calculation and design has not been alleged, as it was not here, Ohio's statutorily defined aggravating circumstance of felony-murder requires that the defendant be "the principal offender in the commission of the aggravated murder." R.C. 2929.04(A)(7).[4] The specification included in the Joseph-Bulerin indictment simply did not give notice of that element, either by setting it forth in the words of the statute, or by including a reference to the statutory number of the felony-murder specification.

---

3. The indictment states:

"THE JURORS OF THE GRAND JURY of the State of Ohio, * * * do find and present that from on or about the 26th day of June, 1990 to on or about the 4th day of July, 1990, at Allen County, Ohio,

"JOSE E. BULERIN AND RICHARD E. JOSEPH, whose real and true names are to the Grand Jury unknown did jointly purposely cause the death of another, to wit: Ryan R. Young, while committing or while fleeing immediately after committing kidnapping;

"*SPECIFICATION*

"The Grand Jurors further find and specify that the offense was committed while the offenders were committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, *and the offenders were the principal offenders in the commission of the kidnapping;* in violation of the Ohio Revised Code, Section 2903.01(B) and against the peace and dignity of the State of Ohio. [Emphasis added.]

"[s/ David E. Bowers]
"Prosecuting Attorney"

4. R.C. 2929.04 provides in relevant part:

"(A) Imposition of the death penalty for aggravated murder is precluded, unless one or more of the following is specified in the indictment or count in the indictment pursuant to section 2941.14 of the Revised Code and proved beyond a reasonable doubt:

"***

"(7) The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, rape, aggravated arson, aggravated robbery, or aggravated burglary, and either the offender was the *principal offender in the commission of the aggravated murder* or, if not the principal offender, committed the aggravated murder with prior calculation and design." (Emphasis added.)

I do not believe that the Ohio Constitution, governing statutes, or rules of procedure, nor this court's prior precedent allows this flaw to be dismissed as harmless.

**{¶ 64}** The majority opinion asserts that Joseph's death sentence may be upheld because defense counsel never challenged the sufficiency of the specification in the indictment, and imputes to the defense knowledge of the elements of the felony-murder death specification. Our established precedent is clear that the "principal offender" requirement of the felony-murder specification set forth in R.C. 2929.04(A)(7) equates to a finding of "actual killer." *State v. Penix* (1987), 32 Ohio St. 3d 369, 513 N.E.2d 744; *State v. Wiles* (1991), 59 Ohio St.3d 71, 92, 571 N.E.2d 97, 122; *State v. Taylor* (1993), 66 Ohio St.3d 295, 308, 612 N.E.2d 316, 325. See, also, *State v. Doty* (1916), 94 Ohio St. 258, 113 N.E.811; *State v. Rogers* (1938), 64 Ohio App. 39, 55, 27 N.E.2d 791, 799 ("Adams was the principal offender as the evidence discloses that he, Adams, was the one who fired the shot that killed the Dickey boy."). My review of the record supports the conclusion that inclusion in the indictment of the phrase "principal offenders in the commission of the *kidnapping*" of Ryan Young was more than a mere clerical or typographical error. The error indicates that this case was tried upon the mistaken theory that a death sentence based upon the statutory aggravating circumstance of felony-murder (R.C. 2929.04[A][7]) could be imposed upon Joseph irrespective of whether Joseph actually inflicted knife wounds on Young.

**{¶ 65}** This conclusion is evidenced most strongly by the prosecutor's own words. During his closing argument made to the jury at the conclusion of the guilt phase, the prosecutor stated:

"We have to prove to you beyond a reasonable doubt that this crime, or crimes, was committed between the 26th day of June of this year and the 4th day of July. We've got a time frame. Frankly, the State of Ohio can't prove to you exactly when the death occurred. We can tell you when [the victim] was last seen. We can tell you

when the car was seen out there. We can tell you where the car was found. The State of Ohio doesn't know.

"Another thing the State of Ohio doesn't know and can't tell you, and it doesn't make any difference as long as you find the two people, Jose Bulerin and Richard E. Joseph, jointly committed these crimes, or this crime, the law is very clear in Ohio that if one person is an aider and abettor, no matter what part he has in it, if he plays a part in the commission of that crime then he's as guilty as the other guy. The State of Ohio can't tell you. I wish I could. I wish I could tell you exactly what happened. *I don't know who struck the death blow.* But, I believe the evidence is very clear that *it was one of the two that's charged here.* If you find one of them did it, or the other one did it, *they're both just as guilty as if each of them had their hands around the hilt of that knife when it was stuck in Ryan Young."* (Emphasis added.)

{¶ 66} Later in closing argument, the prosecutor argued to the jury: "You'll find that they took Ryan Young to some area. *Here again, it doesn't make any difference who did what; who did the cutting."* (Emphasis added.)

{¶ 67} During his rebuttal argument the prosecutor stated:

"[Defense counsel] wants you to infer or surmise that this defendant was not there and it was somebody else. *We don't have to show that this defendant was the one who administered the fatal blows.* He was with him. *We don't know which one did it.* We don't have to prove that." (Emphasis added.)

{¶ 68} These comments did not materially misstate the law in regard to obtaining a guilty verdict as to *the aggravated murder charge* against Joseph. An aider and abettor may be found guilty of aggravated murder even though he is not himself the actual killer. However, "[t]he fact that, pursuant to R.C. 2923.03(F), a defendant who aids and abets another in committing an offense 'shall be prosecuted and punished as if he were a principal offender' and so may be convicted of aggravated murder under R.C. 2903.01(B) does not make the defendant 'the principal offender'

for purposes of imposing the death penalty under R.C. 2929.04(A)(7)." *State v. Taylor*, syllabus.

{¶ 69} It seems unlikely that the prosecutor in this case would have admitted the state's failure to prove the identity of the actual killer had he realized that such an admission precluded a guilty verdict as to the felony-murder death specification. Similarly, the fact that trial defense counsel never raised the issue of the indictment's flaw, and did not address, let alone focus, its defense on the absence of proof of Joseph's "principal offender" status, leads to the conclusion that the defense accepted the prosecutor's legal interpretation. In affirming Joseph's death sentence, this court enters dangerous grounds, by effectively holding that the state may obtain a death sentence based not upon what was *actually* charged in the indictment, but upon what the state *meant* to charge, or *should* have charged in the indictment.

{¶ 70} The framers of the Ohio Constitution clearly were aware of the importance of grand jury review in criminal matters, and thus included Section 10, Article I, which provides in part: "[N]o person shall be held to answer for a capital, or otherwise infamous, crime, unless on presentment or indictment of a grand jury." I find the majority's willingness to excuse the defect in this indictment to significantly undercut the protection against unjust prosecution this constitutional provision was intended to guarantee. In that the prosecutor conceded at trial that it could not prove who actually killed Young, it seems more than simply academic to question whether the grand jury would have ever issued an indictment with a felony-murder specification in the first place had its members been aware that such a specification required proof that Bulerin, Joseph, or both, were "principal offenders in the aggravated murder" of White rather than proof that they both were principal offenders in his kidnapping. This being the case, it is of little significance that the trial court prepared verdict forms consistent with the statutory specification language.[5] Cf. *State*

---

5. The verdict form signed and returned by the jury read as follows:
    "SPECIFICATION

*v. Headley* (1983), 6 Ohio St.3d 475, 478-479, 6 OBR 526, 529, 453 N.E.2d 716, 720 (in light of Section 10 of Article I of the Ohio Constitution, "where one of the vital elements identifying the crime is omitted from the indictment, it is defective and cannot be cured by the court as such a procedure would permit the court to convict the accused on a charge essentially different from that found by the grand jury"). See, also, *State v. O'Brien* (1987), 30 Ohio St.3d 122, 30 OBR 436, 508 N.E.2d 144; *State v. Dilley* (1989), 47 Ohio St.3d 20, 546 N.E.2d 937.

{¶ 71} In addition, in my view Ohio's statutes governing capital punishment preclude imposition of the death penalty in this case. Pursuant to R.C. 2929.03(A), where an indictment fails to contain one or more specifications of aggravating circumstances listed in division (A) of section R.C. 2929.04, a sentence of life imprisonment with parole eligibility after serving twenty years of imprisonment *must* be imposed where a defendant is found guilty of aggravated murder. R.C. 2929.04 provides that "[i]mposition of the death penalty for aggravated murder is precluded" unless one of the specifications set forth in subsections (A)(1) through (7) is specified in the indictment. R.C. 2941.14(B) precludes imposition of the death penalty for aggravated murder "unless the indictment *** specifies one or more of the aggravating circumstances listed in division (A)" of R.C. 2929.04. Although R.C. 2941.14(C) provides for specifications to be stated "in the words of the subdivision in which it appears, or in words sufficient to give the accused notice of the same," I do not believe that the specification included in the indictment issued against Joseph does either.

{¶ 72} Similarly, the majority's reliance on Crim.R. 7(D),[6] which authorizes amendment of indictments in certain circumstances, is misplaced. The fact is that no

---

"The offense charge [*sic*] [was] committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit Kidnapping, and *the offender was the principal offender in the commission of the Aggravated Murder*.

"[dated and signed by 12 jurors]." (Emphasis added.)

Crim.R. 7(D) motion was ever made in this case. Assuming, *arguendo*, that the defect in the amendment was of a nature capable of correction by amendment, had that deficiency been noticed earlier and the provisions of Crim.R. 7(D) been invoked, the defendant would have been entitled by the express terms of the rule to ask for discharge of the sitting jury, and a reasonable continuance. In my view, an appellate court improperly precludes a defendant from invoking that right where the provisions

6. Crim.R. 7 provides:

"(A) Use of indictment or information. *A felony that may be punished by death or life imprisonment shall be prosecuted by indictment.* All other felonies shall be prosecuted by indictment, except that after a defendant has been advised by the court of the nature of the charge against the defendant and of the defendant's right to indictment, the defendant may waive that right in writing and in open court.
"***
"(B) Nature and contents. The indictment shall be signed, in accordance with Crim. R. 6 (C) and (F) and contain a statement that the defendant has committed a public offense specified in the indictment. The information shall be signed by the prosecuting attorney or in the name of the prosecuting attorney by an assistant prosecuting attorney and shall contain a statement that the defendant has committed a public offense specified in the information. *The statement may be made in ordinary and concise language without technical averments or allegations not essential to be proved. The statement may be in the words of the applicable section of the statute, provided the words of that statute charge an offense, or in words sufficient to give the defendant notice of all the elements of the offense with which the defendant is charged.* It may be alleged in a single count that the means by which the defendant committed the offense are unknown or that the defendant committed it by one or more specified means. Each count of the indictment or information shall state the numerical designation of the statute that the defendant is alleged to have violated. Error in the numerical designation or omission of the numerical designation shall not be ground for dismissal of the indictment or information, or for reversal of a conviction, if the error or omission did not prejudicially mislead the defendant.
"***
"(D) Amendment of indictment, information, or complaint. *The court may at any time before, during, or after a trial amend the indictment,* information, complaint, or bill of particulars, *in respect to any defect, imperfection, or omission in form or substance, or of any variance with the evidence, provided no change is made in the name or identity of the crime charged.* If any amendment is made to the substance of the indictment, information, or complaint, or to cure a variance between the indictment, information, or complaint and the proof, the defendant is entitled to a discharge of the jury on the defendant's motion, if a jury has been impanelled, and to a reasonable continuance, unless it clearly appears from the whole proceedings that the defendant has not been misled or prejudiced by the defect or variance in respect to which the amendment is made, or that the defendant's rights will be fully protected by proceeding with the trial, or by a postponement thereof to a later day with the same or another jury. Where a jury is discharged under this division, jeopardy shall not attach to the offense charged in the amended indictment, information, or complaint. No action of the court in refusing a continuance or postponement under this division is reviewable except after motion to grant a new trial therefor is refused by the trial court, and no appeal based upon such action of the court shall be sustained nor reversal had unless, from consideration of the whole proceedings, the reviewing court finds that a failure of justice resulted." (Emphasis added.)

of Crim.R. 7 are first asserted upon appeal.  Nor is it our role, as a reviewing court, to determine in the first instance that it "clearly appears from the whole proceedings that the defendant [was not] misled or prejudiced by the defect or variance in respect to which the amendment [was] made," or that the defendant's rights were otherwise fully protected.

{¶ 73} The simple facts remain that the grand jury in this case issued an indictment which did not make factual allegations falling within the scope of a statutorily defined aggravating circumstance, nor did it reference R.C. 2929.04(A)(7) by statutory number.  This deficiency was never corrected by amendment pursuant to Crim.R. 7 or otherwise.  I believe that these factual circumstances, combined with a record which shows the case to have been tried pursuant to a misunderstanding of the law's requirements, constituted plain error, which, had it not occurred, might well have resulted in a different verdict as to the death specification.  I therefore believe that this error precludes imposition of a death sentence upon Joseph.

*Insufficiency of the Evidence Related to the Death Penalty*

**{¶ 74}** I agree with the majority to the extent that significant circumstantial evidence was produced by the state to support a finding that Joseph was involved in the murder of Young and that he was *either* himself the killer *or* was an aider and abettor in the murder, and that either finding would support a conviction of aggravated felony-murder. R. C. 2903.01(B); *Taylor*, *supra*. However, this record contains no evidence, either direct or circumstantial, as to who held the knife (or knives) that were thrust into Young causing his death. The state simply did not prove Joseph guilty of a felony-murder death specification beyond a reasonable doubt. It instead conceded that it knew virtually nothing as to the precise circumstances by which Young was murdered, including the facts as to who was his actual killer (or killers).

**{¶ 75}** This court has decided past cases in which more than one individual have been deemed to be a "principal offender" in one murder. In those cases, however, there has been evidence supporting a finding that the physical acts of more than one defendant together contributed to cause death. In other cases the evidence supports the conclusion that only one actor was involved in an aggravated murder. See, *e.g.*, *State v. Murphy* (1992), 65 Ohio St.3d 554, 584, 605 N.E.2d 884, 908. In those cases, the actor has been recognized to be death-eligible as the "principal offender" because, in the absence of an aider or abettor, a finding of guilt of aggravated murder necessarily requires a finding that the guilty party was also the "principal offender."

**{¶ 76}** The evidence produced by the state at this trial is unlike the evidence in these categories of cases. In this case only two people (Joseph and his co-indictee Jose Bulerin) know which of them "actually killed" Young, or whether they both did. Neither of them testified in this trial, nor did the state produce confessions to disclose those facts. The state never found the murder weapon; hence, the weapon could not be traced to one or both of the defendants through fingerprints or other circumstantial evidence. We do not know exactly where Young was killed (no evidence was presented of blood in either Young's car or the Forest car) or any other circumstances

surrounding his stabbing. Perhaps most significantly, the state conceded in its arguments to the jury that it did not know who stabbed Young ("I don't know who struck the death blow. *** [I]t was one of the two that's charged here." "[I]t doesn't make any difference who did what; who did the cutting.")

{¶ 77} In short, the record is sufficient to support *speculation* as to who actually killed Young. Clearly this defendant had a motive. However, proof of a motive is not proof of guilty conduct. On the other hand, testimony was presented that the co-defendant Bulerin (age late thirties) was highly involved with martial arts, and protective of "his kid" (Joseph). Forest confirmed that Bulerin had indicated that he would "either snap your neck or put a bullet through your head and throw you out alongside the road" if you ever "screwed with or messed with" him or Joseph. Joseph's mother testified that, on one occasion when her son was ill, Bulerin told her not to "waste [her] time" in attempting to take Joseph home with her because she "wasn't going to get [her] son." She testified that Bulerin had threatened to break into her home and take something, or kill her dogs. At Joseph's mitigation hearing, Bulerin's ex-wife testified that, while she could not believe Joseph actually killed Young, she could believe that behavior of Bulerin.

{¶ 78} Unfortunately, however, the evidence produced by the state does not confirm either speculation. We simply do not know, on the basis of this record, who killed Young. Having complied with our statutory responsibility pursuant to R.C. 2929.05 to make an independent review of the record to "determine if the evidence supports the finding of the aggravating circumstances the trial jury *** found the offender guilty of committing," I do not find that this record supports a finding that Joseph was proven guilty of being a principal offender, *i.e.*, actual killer, in the felony-murder of Young. I therefore believe it is the duty of this court to disaffirm the sentence of death imposed upon Richard Joseph.

DESHLER, J., concurs in the foregoing opinion.

———————————

**Cook, J., concurring in part and dissenting in part.**

{¶ 79} Like Chief Justice Moyer and Judge Deshler, I dissent from the majority opinion as to the sentence of death. I write separately because, unlike them, I find the flawed indictment to be harmless error. I do agree, however, with Chief Justice Moyer's dissent on the sufficiency-of-the-evidence issue. Given that the decisional law defines "principal offender" with respect to the penalty phase as an "actual killer," and that this jury was misled throughout the proceedings that to reach a sentence recommendation it need not resolve the issue of whether Joseph or Bulerin was the actual killer (or that they both were), I cannot concur in the imposition of the death penalty.

{¶ 80} Future cases with similar evidence—with two potential killers present at a murder and no witness as to which one killed the victim or whether it was a joint effort—ought to merit further instruction beyond what was given here. The trial court should instruct in such a case that "principal offender," as used in the death-penalty specification, means one who actually kills the victim; not one who just aids and abets in the commission of the aggravated murder.

—————————

APPENDIX

{¶ 81} "Proposition of Law No. I[:] An indictment that fails to set forth an offense for which the sentence of death may be imposed is invalid as to the capital offense and the death sentence which resulted is void.

{¶ 82} "Proposition of Law No. II[:] The proper remedy for the state's willful failure to disclose that its chief witness has been granted immunity is a mistrial or the striking of the witnesses [*sic*] testimony.

{¶ 83} "Proposition of Law III[:] When a death sentence is both unreliable and inappropriate it must be vacated and a life sentence imposed.

{¶ 84} "Proposition of Law IV[:]  When the death sentence is excessive and disproportionate to the sentence in similar cases, the death sentence must be vacated and a life sentence imposed.

{¶ 85} "Proposition of Law V[:]  When every single potential juror in a capital trial has been exposed to pre-trial publicity and victim impact evidence, it is an abuse of discretion for the trial court to deny the defendant's motion for change of venue.

{¶ 86} "Proposition of Law VI[:]  A trial court denies a capital defendant the right to a fair trial and to due process of law [when] it erroneously instructs the jury during the guilt-innocence phase of a capital case.

{¶ 87} "Proposition of Law VII[:]  Erroneous instructions at the penalty phase of a capital case result in an unreliable determination of the proper penalty in a capital trial.

{¶ 88} "Proposition of Law VIII[:]  When a trial court fails to consider mitigating evidence presented during the penalty phase of a capital case and considers erroneous aggravating circumstances in making its determination to impose the death sentence the death sentence must be vacated.

{¶ 89} "Proposition of Law IX[:]  When a prosecutor's pattern of misconduct throughout both phases of a capital trial and closing argument deprive a capital defendant of a fair trial the appropriate remedy is a new trial.

{¶ 90} "Proposition of Law X[:]  A reviewing court may not apply a new rule of law in an *ex post fact* [sic] manner when the new rule reduces the state's burden of supporting a capital conviction.

{¶ 91} "Proposition of Law XI[:]  A conviction for aggravated murder may not be sustained when the evidence presented does not meet the legal requirements to prove the elements of the crime.

{¶ 92} "Proposition of Law XII[:]  When the trial court allows a capital jury to hear prejudicial irrelevant evidence, a mistrial should be declared.

{¶ 93} "Proposition of Law XIII[:] The failure to object to numerous errors at trial, to adequately address substantial capital issues, and to prepare a meaningful penalty phase case deprives a capital defendant of the effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the United States Constitution, Article I, Sections 10 and 16 of the Ohio Constitution.

{¶ 94} "Proposition of Law XIV[:] When the trial court refuses to instruct a jury to select one of the available life sentences after the jury informs the court that it is deadlocked on the death penalty, a capital defendant is denied the right to a fair trial and a reliable sentencing determination in violation of the Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 5, 6 and 16, Article I of the Ohio Constitution.

{¶ 95} "Proposition of Law XV[:] When a trial court in a capital trial erroneously denies a challenge for cause against a juror who is biased, reversible error occurs when the defendant is forced to use a peremptory challenge to remove the juror.

{¶ 96} "Proposition of Law XVI[:] Exhibits that have been admitted into evidence in the guilt-innocence phase of a capital case can only be readmitted in the penalty phase if they are relevant to the aggravating circumstances proved in the guilt-innocence phase or to mitigating factors presented in the penalty phase.

{¶ 97} "Proposition of Law XVII[:] A criminal defendant has a right to be present at all proceedings, including in-chambers conferences, unless he voluntarily absents himself from the proceeding.

{¶ 98} "Proposition of Law XVIII[:] When a trial court permits the admission of expert opinion testimony that is not properly qualified or based on reasonable scientific certainty, a capital defendant is denied his right to a fair trial and to due process of law in violation of the Fifth and Fourteenth Amendments to the United States Constitution. and Section 16, Article I of the Ohio Constitution.

{¶ 99} "Proposition of Law XIX[:] When a trial court admits into evidence statements by a defendant which were not knowingly, voluntarily and intelligently given, the defendant is denied his rights to a fair trial and against self-incrimination in violation of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Sections 2, 9, 10 and 16 of the Ohio Constitution.

{¶ 100} "Proposition of Law XX[:] When gruesome and prejudicial photographs are admitted into evidence even though their prejudicial effect outweighs their probative value, a capital defendant is denied his rights to a fair trial, due process of law and a reliable sentencing determination as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, Article I, Sections 10 and 16 of the Ohio Constitution.

{¶ 101} Proposition of Law XXI[:] A trial court should refuse to allow the introduction or admission of evidence unless the state can clearly show that the evidence it seeks to introduce is related to the defendant or the crime with which he is charged.

{¶ 102} "Proposition of Law XXII[:] A witness may testify as an expert if the witnesses [*sic*] testimony is based on reliable scientific, technical, or other specialized information to the extent that the testimony reports the result of a procedure, test, or experiment and the testimony is reliable.

{¶ 103} "Proposition of Law XXIII[:] Evidence is not admissible against a defendant unless the state first establishes that a foundation exists to tie the evidence to the defendant.

{¶ 104} "Proposition of Law XXIV[:] Absent any indication that a witness is hostile, an adverse witness or a witness identified with an adverse party, questioning by use of leading questions on direct examination is prohibited.

{¶ 105} "Proposition of Law XXV[:] Hearsay evidence which lacks any indication of trustworthiness is inadmissible.

{¶ 106} "Proposition of Law XXVI[:] A capital defendant is denied a fair trial when the trial court refuses to permit the voir dire to be video taped.

{¶ 107} "Proposition of Law XXVII[:] When a trial court unduly restricts voir dire related to mitigation and sentencing issues, a capital defendant is denied a fair trial and reliable sentencing determination.

{¶ 108} "Proposition of Law XXVIII[:] The statements from the prosecutor that the jury's verdict at the penalty phase was only a recommendation violated the Eighth and Fourteenth Amendments to the United States Constitution as well as Article I, Sections 2, 9, 10 and 16 of the Ohio Constitution.

{¶ 109} "Proposition of Law XXIX[:] A trial court deprives a capital defendant the right to a fair and impartial jury when it asks questions during an individual sequestered voir dire which tend to 'death qualify' the jury.

{¶ 110} "Proposition of Law XXX[:] The trial court erred to the prejudice of appellant Joseph in allowing the prosecutor to perempt jurors with reservations about the death penalty.

{¶ 111} "Proposition of Law XXXI[:] A capital defendant is denied the right to a fair trial and to due process of law when the trial court refuses to allow alternating voir dire.

{¶ 112} "Proposition of Law XXXII[:] After a witness testifies, the trial court should conduct an in camera inspection of the witness's written statement with the defense counsel and the prosecuting attorney present and participating to determine any inconsistencies between the witness's testimony and any prior statement. (Ohio R.Crim.P. 16(B)(1)(g) applied.)

{¶ 113} "Proposition of Law XXXIII[:] When a trial court, on its own, orders the Grand Jury transcripts to be transcribed and then treats the transcripts as if they were witness statements pursuant to Ohio R.Crim.P. 16(B)(1)(g), the Grand Jury transcripts should be turned over to defense counsel for inspection.

**{¶ 114}** "Proposition of Law XXXIV[:] On direct appeal as of right to the court of appeals in a capital case, a capital appellant is entitled to the review of his entire record by the court of appeals.

**{¶ 115}** "Proposition of Law XXXV[:] The state has an obligation to preserve evidence used to secure a conviction in a capital case.

**{¶ 116}** "Proposition of Law XXXVI[:] The Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and Sections 2, 9, 10 and 16, Article I of the Ohio Constitution establish the requirements for a valid death penalty scheme. Ohio Revised Code, Section[s] 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 and 2929.05, Ohio's statutory provisions governing the imposition of the death penalty, do not meet the prescribed requirements and thus are unconstitutional, both on their face and as applied."