OPINION
Willie D. Jenkins was found guilty of rape and felonious assault by a jury in the Montgomery County Court of Common Pleas. He was sentenced to ten years of imprisonment for rape and to eight years for felonious assault, to be served concurrently.
Jenkins appeals from his convictions.
The state's evidence established the following facts.
In the early morning hours of July 12, 2000, Ramona Taylor fled from her apartment, hysterical, naked, bruised, and bleeding. She first banged on the door of her neighbor, Narleski Cranford, and, when he did not answer quickly, she ran to the apartment of his sister, Cabrina Cranford, who also lived in the building. Taylor reported to Cabrina and later to Narleski that she had been beaten and anally raped by her boyfriend, Jenkins. Taylor stayed in Cabrina's apartment for several hours, during which she was in a great deal of pain and was unable to control her bowel movements. During this time, Jenkins came to the apartment, but Cabrina refused to let him in. The police were called in the late morning. Police Officer Lisa Foster responded to Cabrina's apartment and helped to transport Taylor to the hospital. Taylor was later interviewed at the hospital by Detective Catherine Miller, and a sexual assault kit was completed. Taylor reported to Foster, Miller, and medical personnel that she had been raped.
While she was at the hospital, Taylor began to express reservations about filing rape charges against Jenkins, although she was willing to file assault charges. Taylor expressed fear about what Jenkins or his friends would do to her if she pursued rape charges. Nonetheless, Taylor signed a consent form for completion of the sexual assault kit and for the release of the evidence to law enforcement officials.
On July 21, 2000, the state indicted Jenkins on one count of rape and one count of felonious assault. Taylor refused to cooperate in the prosecution, claiming that she had consented to having sex with Jenkins on the night in question and that she had been drunk when she fled her apartment. The state proceeded with its case against Jenkins, relying on the testimony of the neighbors, police officers, and medical personnel regarding Taylor's claims of rape on the night of the attack. Jenkins filed motions in limine to exclude this testimony on the grounds that it was impermissible hearsay or that it violated the physician-patient privilege. The trial court conducted a hearing on the motions and ruled that the evidence would be allowed. Thus, the neighbors, police officers, and medical personnel testified for the state at trial; Jenkins and Taylor testified for the defense, claiming that their sexual relations on July 12, 2000 had been consensual. Jenkins was thereafter convicted of rape and felonious assault and was sentenced accordingly.
Jenkins raises three assignments of error on appeal.
 I. THE TRIAL COURT ERRED WHEN IT ALLOWED INADMISSIBLE HEARSAY TO BE PRESENTED TO THE JURY.
The trial court permitted Cabrina Cranford, Narleski Cranford, Foster, and Miller to testify about Taylor's statements to them in the hours after the attack under the excited utterance exception to the hearsay rule. Jenkins claims that the trial court abused its discretion in allowing this testimony.
The trial court has broad discretion in the admission of evidence and, unless the trial court has clearly abused its discretion and the defendant has been materially prejudiced thereby, an appellate court should not disturb its decision. State v. Joseph (1995), 73 Ohio St.3d 450,460; State v. Sage (1987), 31 Ohio St.3d 173, paragraph two of the syllabus.
Evid.R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Hearsay is generally inadmissible, unless the evidence falls within one of the recognized exceptions. Evid.R. 802. One such exception is the "excited utterance," which Evid.R. 803(2) defines as a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." We have held that the following conditions are necessary for a trial court to determine that statements are admissible as excited utterances:
 (a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement or declaration spontaneous and unreflective, (b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties, so that such domination continued to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, (c) that the statement or declaration related to such startling occurrence or the circumstances of such startling occurrence, and (d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration.
(Emphasis sic.) State v. Stephens (May 12, 2000), Montgomery App. No. 17851, unreported.
The trial court held a hearing at which the state presented evidence concerning Taylor's state of mind at the time that the statements in question were made. Cabrina Cranford, the neighbor living in the apartment to which Taylor fled, testified that Taylor had been "hysterical," crying and scared when she had arrived at the apartment. Cabrina testified that Taylor had been naked, bleeding, and bruised and that the "[m]inute she came in the door" Taylor had stated that Jenkins had jumped on her, beaten her, and raped her. Cabrina's brother, Narleski Cranford, arrived at the apartment a short time later. He also testified at the hearing that Taylor had been badly beaten, had been bleeding, and had been "hysterical," crying, and "hyperventilating" to the point that he thought she might pass out. Narleski also stated that Taylor had claimed to have been beaten up and anally raped by Jenkins.
The testimony of Cabrina and Narleski Cranford supported the trial court's conclusion that Taylor's statements to them that she had been raped by Jenkins had been made while she remained affected by the nervous excitement of the event, that the statements had been spontaneous and unreflective, and that they had been a sincere expression of Taylor's beliefs. The trial court did not abuse its discretion when it permitted the Cranfords to testify regarding these statements.
Police Officer Lisa Foster testified that Taylor had been crying, upset, and frightened when Foster had arrived at Cabrina's apartment around 11:00 a.m. on July 12, 2000. Foster testified that Taylor had been in excruciating pain, that movement had been very difficult for her, and that Taylor had said that "her buttocks were just killing her." Taylor had reported to Foster that she had been raped, but Foster could not recall whether Taylor had named Jenkins as the perpetrator. Although several hours had elapsed between the time of the rape and Foster's encounter with Taylor, based on Foster's testimony about Taylor's condition and state of mind, the trial court did not abuse its discretion in concluding that Taylor's statements to Foster fell within the excited utterance exception to the hearsay rule.
Finally, the trial court also permitted Detective Catherine Miller to testify pursuant to the excited utterance exception. Miller had interviewed Taylor at the hospital on July 12, 2000. Miller testified that Taylor had been in a lot of pain but that she had had no trouble recounting the events of the previous night. Regarding Taylor's emotional state at the time of their interview, Miller stated that Taylor had expressed hesitance about having a sexual assault examination and evidence collection kit performed "since it was in the anal area." She also stated that Taylor had been "upset" about the rape and was crying on and off at the time of the interview. On cross-examination, Miller testified that, during their interview, Taylor had expressed her willingness to file assault charges against Jenkins but had expressed reservations about filing rape charges because she feared Jenkins and his friends and believed that he would be "a lot madder if she filed the rape charges" than if she filed assault charges.
In our view, the trial court erred in admitting Miller's testimony pursuant to the excited utterance exception to the hearsay rule because Miller testified only that Taylor had been "upset" about the rape and had been crying on and off at the time of the interview. This evidence did not evince the type of nervous excitement or unreflective expressions present in her conversations with the other witnesses who were allowed to testify about her statements after the rape. Many hours had elapsed since the time of the rape, and Miller's testimony at the hearing did not establish that Taylor had spoken to her with the nervous excitement, spontaneity, and fear that had been present when she spoke with the Cranfords and Foster. Moreover, Taylor's comments to Miller about her reluctance to file a rape charge against Jenkins but her willingness to file an assault charge-feelings that were based on her beliefs about how Jenkins would react to the different charges-demonstrate that, by the time Taylor spoke with Miller, she was engaging in precisely the type of reflection that must be absent from an excited utterance. See Stephens, supra. Thus, the trial court should not have admitted this testimony under the excited utterance exception to the hearsay rule.
Although the trial court erred in admitting Miller's testimony, we note that Miller's testimony that Taylor had reported being raped in the hours after the attack was cumulative of the testimony of the Cranfords and Foster. Thus, we are unpersuaded that the error prejudiced Jenkins, and we will not reverse the trial court's judgment on that basis.
The first assignment of error is overruled.
 II. THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT PERMITTED TESTIMONY TO BE PRESENTED IN VIOLATION OF THE MANDATES OF R.C. 2317.02.
Jenkins claims that the trial court erred in allowing hospital personnel to testify regarding Taylor's statements and the results of her sexual assault examination. He claims that such testimony was offered in violation of R.C. 2317.02(B), which sets forth the physician-patient privilege. The trial court concluded that Taylor had waived the privilege by voluntarily consenting to the sexual assault examination, knowing that the sexual assault kit would be released to third parties, and that she could not subsequently reassert the privilege. For three reasons, we find that the trial court did not abuse its discretion in reaching this conclusion.
First, at the hearing on the motions in limine, the nurse who completed the sexual assault kit and a victim advocate each testified that, while they had encouraged Taylor to have the kit completed, they had not pressured her to do so. Both women further testified that, although Taylor had been hesitant to go through with the exam initially, she had ultimately agreed. A Consent for Exam and Release of Evidence form that had been signed by Taylor was also admitted into evidence. On this form, Taylor had authorized the examination itself and the release of the evidence obtained as a result of the examination. Taylor conceded that she had read and signed the form voluntarily but claimed that she had not understood it.
Based on this evidence, the trial court concluded that Taylor had given a valid consent to the sexual assault examination and that, having given that consent, she had no expectation of privacy in the results of the examination and could not reassert the physician-patient privilege. The court found that the language of the consent form made it "extremely clear" that Taylor was authorizing the release of information to law enforcement officials knowing that it would be used in an investigation and in the prosecution of the crime. The trial court found Taylor's claims that she had not understood "the full implication of what she was consenting to" lacking in credibility. The court stated that there was no evidence from which it could conclude that Taylor had been coerced into signing the consent and release form. The trial court did not err in reaching this conclusion.
Second, the defense relied upon Taylor's medical records and elicited testimony about them during her direct examination, apparently in an effort to show that she had not been seriously injured. Defense counsel elicited the following testimony:
 Q: * * * [Y]ou know Miss Taylor that your medical records are privileged, right?
A: Yeah.
 Q: Is it all right [sic] if the jury sees the doctor's notes from when she saw you?
A: Yes.
Q: So you would waive that privilege?
A: Yes.
Q: As far as the doctor's notes are concerned?
 A: Yeah, because she told me I was okay, there was nothing wrong with me. * * * 361
Defense counsel proceeded to question Taylor about State's Exhibit 1, which consisted of the Consent for Exam and Release of Evidence, an assault history, and examination notes that had been completed by nurse Kathleen Black. The trial court could have reasonably concluded from this testimony that Taylor had affirmatively waived the physician-patient privilege in court.
Third, we note that Jenkins is not entitled to assert the physician-patient privilege on Taylor's behalf. See State v. Bourdess (Oct. 7, 1999), Cuyahoga App. No. 74842, unreported, citing Hunter v. Hawkes Hosp. of Mt. Carmel (1989), 62 Ohio App.3d 155, 157.
The second assignment of error is overruled.
 III. THE VERDICT RENDERED BY THE JURY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Jenkins points out that "only two [individuals] * * * knew exactly what occurred in [Taylor's] apartment" on July 12, 2000-he and Taylor-and that both of them testified at trial that they had had consensual anal intercourse, which was not uncommon for them. Jenkins contends that, because the state could offer no other witnesses with personal knowledge of the events in question, the decision of the trial court with respect to rape was against the manifest weight of the evidence.
In determining whether a conviction is against the manifest weight of the evidence, we review the entire record, weigh the evidence and all reasonable inferences, consider witnesses' credibility, and determine whether, in resolving conflicts in the evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. State v. Thompkins (1997), 78 Ohio St.3d 380,387, citing State v. Martin (1983), 20 Ohio App.3d 172, 175. We defer to the trial court's determinations of witness credibility because the decision whether, and to what extent, to credit the testimony of a particular witness is within the peculiar competence of the fact finder, who has seen and heard the witness. State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288, unreported. Appellate courts should reverse a conviction as being against the manifest weight of the evidence only in exceptional circumstances in which the evidence weighs heavily against the conviction. Martin, 20 Ohio App.3d at 175.
As discussed supra, Taylor's neighbor, Cabrina Cranford, testified that Taylor had come to her apartment naked, beaten, and bloody on the morning of July 12, 2000, and had immediately stated that Jenkins had anally raped her. Cabrina's brother, Narleski, also testified that Taylor had claimed to have been anally raped by Jenkins, had been badly beaten, had been bleeding, and had been in a lot of pain. Cabrina and Narleski each testified that Taylor had been unable to control her bowels as a result of the attack. According to Narleski, Taylor reported that Jenkins had "kept hitting her, knocked her down and stomped her in her face," 208and Narleski had thought that Taylor was losing consciousness several times. 211
Officer Foster testified that Taylor had reported to her that Jenkins had hit her repeatedly both with an open hand and with a closed fist, that he had dragged her down the hallway by her hair, had repeatedly hit her against a wall, and had raped her. With respect to Taylor's appearance, Foster testified that Taylor had a lot of swelling in her eyes and face, that "the whites of her eyes were completely red," 232that she had deep purple and blue bruises on her face, eyes, jaw, arms, and legs, and that her mouth was bleeding. Foster also testified that, when she had tried to walk Taylor to an ambulance, Taylor's motion had been very limited, she had needed substantial assistance, and she had had to stop repeatedly because of nausea caused by the pain.
Detective Miller, who interviewed Taylor at the hospital, also testified that Taylor's face had been swollen and that she had had "purplish" bruising of her face, arms, neck, and legs.
Kathleen Black, the nurse who treated Taylor in the emergency room, testified that, as part of Taylor's medical care, Black had elicited from her a description of the attack. Taylor reported to Black that Jenkins had become upset after stepping outside the apartment to talk with some neighbors and had ordered her to the bedroom when he came back inside. Taylor reported that she had been reluctant to obey and that Jenkins had said, "[D]on't make me fuck you up." Taylor reported to Black being grabbed and dragged by the hair, having her head pounded against the cupboards, the sink, and the wall, being thrown and falling several times, and being forced to have anal intercourse. Black's physical examination revealed two black eyes, extensive bruising of the face, arms, legs, and buttocks, and eight tears around the anus. Black testified that the injuries to the anus would have been caused by "blunt force."
Based on the state's evidence, the jury could have reasonably concluded that Jenkins had raped and assaulted Taylor. Although Taylor testified that her anal intercourse with Jenkins on the night in question had been consensual, that her behavior had been caused by her intoxication, and that she had been misunderstood and mistreated by all of the people with whom she came in contact in the following hours, the jury was entitled to weigh that testimony against the other evidence, which it obviously found to be more credible. Likewise, the jury was not required to credit Jenkins' testimony that he had not raped Taylor and that he did not know how her injuries had occurred. The jury's verdict was not against the manifest weight of the evidence with respect to the rape or the felonious assault.
The third assignment of error is overruled.
The judgment of the trial court will be affirmed.
GRADY, J. and YOUNG, J., concur.