OPINION
{¶ 1} Defendant-appellant, Kenneth Browne, appeals from a Columbiana County Common Pleas Court judgment convicting him of two counts of nonsupport of his dependents following a jury trial.
 {¶ 2} Appellant married Tammy Lyda in 1988. They had two children together, Katy (d.o.b. 8/21/89) and Kassandra (d.o.b. 10/12/91). Appellant and Tammy were granted a dissolution in 1993. As part of the dissolution order, appellant was to pay child support for his two daughters.
 {¶ 3} Appellant married Karen Halverstadt later that year. They had one child together, Nicole (d.o.b. 4/4/95). Additionally, appellant adopted Karen's two other children, Shawn (d.o.b. 10/21/85) and Ashley (d.o.b. 7/26/83). Appellant and Karen divorced in 2000. As part of the divorce decree, appellant was ordered to pay child support for these three children.
 {¶ 4} In 2000, appellant left his job with the Ohio State Highway Patrol. At this time he stopped making child support payments to Tammy. Appellant made only one child support payment to Karen.
 {¶ 5} The Columbiana County Child Support Enforcement Agency (CSEA) sent appellant default letters in 2000 and 2001. Review hearings were held and appellant was found to be in contempt of the dissolution and divorce orders. A magistrate ordered appellant into the Seek Work Program. Appellant registered for the program, but never complied with it. Sometime prior to November 2001, appellant moved out of Ohio. By January 2004, appellant was in arrears of over $60,000 combined for both cases.
 {¶ 6} A Columbiana County grand jury indicted appellant on two counts of nonsupport of dependents, fifth-degree felonies in violation of R.C. 2919.21(A)(2). Count one was for the nonsupport of Katy and Kassandra and count two was for the nonsupport of Nicole, Shawn, and Ashley. The case proceeded to a jury trial. The jury found appellant guilty as charged. The trial court subsequently sentenced appellant to ten months of incarceration on each count to be served concurrently. Appellant filed a timely notice of appeal on May 4, 2005.
 {¶ 7} Appellant now raises two assignments of error, the first of which states:
 {¶ 8} "THE LOWER COURT ERRED IN ALLOWING THE STATE TO ADMIT TESTIMONY REGARDING THE APPELLANT'S ALLEGED SEXUAL MISCONDUCT WITH A MINOR CHILD AS IT WAS IRRELEVANT. FURTHER, ITS PROBATIVE VALUE WAS SUBSTANTIALLY OUTWEIGHED BY THE DANGER OF UNFAIR PREJUDICE, CONFUSION OF THE EVIDENCE AND MISLEADING THE JURY."
 {¶ 9} Appellant argues that the trial court abused its discretion in permitting three witnesses to testify about certain subjects. He claims that the testimony cited below served no purpose other than to incite the jury and prejudice them against him.
 {¶ 10} The admission or exclusion of evidence is within the trial court's discretion. State v. Sage (1987),31 Ohio St.3d 173, 180, 510 N.E.2d 343. Thus, we will not reverse the trial court's decision absent an abuse of discretion. Abuse of discretion requires more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. State v. Clark (1994), 71 Ohio St.3d 466, 470,644 N.E.2d 331.
 {¶ 11} First, appellant argues that the court should not have allowed Karen to testify regarding his alleged sexual misconduct with his adopted daughter Ashley.
 {¶ 12} The testimony appellant now takes issue with is as follows. The prosecution re-called Karen on rebuttal to testify as to why appellant was hospitalized in March 2000. The prosecutor asked Karen what happened between appellant and her daughter Ashley. (Tr. 390). Appellant's counsel objected and the court overruled the objection. (Tr. 390). Karen stated that she had suspicions that something sexual was going on between appellant and Ashley and that appellant may have been abusing Ashley. (Tr. 390). She stated that she found love letters in appellant's briefcase between him and Ashley that confirmed her suspicions. (Tr. 390). Karen confronted appellant with the letters and also showed them to her minister, who in turn turned the letters over to CSEA or the sheriff's department. (Tr. 390-91). She testified that appellant then admitted himself to the Windsor Hospital. (Tr. 391).
 {¶ 13} During appellant's case-in-chief, he called Dr. Dennis McArthur, a clinical psychologist, as his expert witness. Dr. McArthur met with appellant, conducted testing with him, and prepared an evaluation. Dr. McArthur testified that in preparing his evaluation of appellant he examined a summary prepared by the Windsor Hospital in 2000 (Windsor report), when appellant was hospitalized there. (Tr. 279). Dr. McArthur examined the Windsor report in order to compare it to his findings in 2004 to see if appellant had an ongoing psychological problem. (Tr. 279). Dr. McArthur found that appellant was highly depressed, showed signs of schizotypal thinking, and was highly suspicious. (Tr. 281-82). He stated that these findings were consistent with the Windsor report. (Tr. 282).
 {¶ 14} Dr. McArthur concluded that appellant was not psychologically able to work at this time. (Tr. 288). He further concluded that based on the Windsor report, appellant would not have been able to work back in 2000 either. (Tr. 289).
 {¶ 15} On cross-examination, the prosecutor asked Dr. McArthur if he knew why appellant had been admitted into the hospital in 2000. (Tr. 301). Dr. McArthur replied that appellant had suicidal thoughts that were brought on by an accusation of sexual molestation against him. (Tr. 301). Appellant did not object to this testimony. Later, in questioning Dr. McArthur about a particular portion of the Windsor report, the prosecutor asked him if he read in the report that appellant felt that he was acutely depressed as a result of the allegation that he had been having sex with his daughter. (Tr. 306). Dr. McArthur acknowledged that part of the report and also acknowledged that appellant's wife discovered love letters between appellant and his daughter. (Tr. 306). He further acknowledged that appellant was highly concerned over the fact that he might be sentenced to prison for 35 years because of the allegations surrounding his daughter. (Tr. 307).
 {¶ 16} The prosecutor used these questions on cross-examination in an attempt to show that appellant became depressed when the allegations about his daughter arose. This was to demonstrate that appellant had not suffered from a personality disorder throughout his adult life as Dr. McArthur had suggested. (Tr. 307-313).
 {¶ 17} Appellant never objected to any of this testimony, which preceded Karen's testimony that appellant now takes issue with. By the time Karen testified as to the allegations surrounding appellant and her daughter, the jury had already heard that information from Dr. McArthur. Thus, appellant waived the right to challenge such evidence when Karen testified about it.
 {¶ 18} We reached a similar conclusion in State v. Shaw,
7th Dist. No. 03-JE1-4, 2004-Ohio-5121. In that case, Shaw objected at trial to the admission of two drug exhibits when the state formally offered them into evidence. The trial court overruled the objection because two witnesses had already testified about those drug exhibits. Shaw never objected to the exhibits when the two witnesses testified about them.
 {¶ 19} This court stated: "Evid.R. 103(A)(1) provides that error may not be predicated upon a ruling that admits evidence unless the party opposing the admission timely objects. Further, one's failure to object to the use of evidence when the alleged error could be remedied waives the right to address that issue on appeal." Id. at ¶ 18. We concluded that the trial court's decision to admit the two exhibits was within its discretion because the pertinent testimony had already been offered to the jury without objection and that the introduction of those exhibits was not unfairly prejudicial since any alleged prejudice was waived. Id. at ¶ 21.
 {¶ 20} We now reach the same conclusion here as in Shaw.
Because appellant never objected when Dr. McArthur testified about the allegations regarding appellant and his daughter, the jury already heard that evidence before Karen testified about it. Thus, the trial court did not abuse its discretion in overruling appellant's objection to Karen's testimony on the subject.
 {¶ 21} Appellant next argues that the court should not have permitted Karen to testify about his personality traits.
 {¶ 22} On rebuttal, the prosecutor asked Karen to describe appellant's overriding personality traits. (Tr. 393). She stated: "Very strong. Very controlling. Very manipulative. Very mentally abusive." (Tr. 393).
 {¶ 23} While appellant now takes issue with this particular testimony, he did not object to it at trial. Thus, he has waived all but plain error. Plain error should be invoked only to prevent a clear miscarriage of justice. State v. Underwood
(1983), 3 Ohio St.3d 12, 14, 444 N.E.2d 1332. "Plain error does not exist unless, but for the error, the outcome at trial would have been different." State v. Joseph (1995),73 Ohio St.3d 450, 455, 653 N.E.2d 285.
 {¶ 24} Generally, evidence of a person's character or a trait of his character is not admissible to prove that he acted in conformity therewith on a particular occasion. Evid.R. 404(A). However, evidence of a pertinent trait of the defendant's character offered by an accused, or by the prosecution to rebut the same is admissible. Evid.R. 404(A)(1).
 {¶ 25} The focus of this case, in a sense, was appellant's personality. Appellant's entire defense centered on his allegation that he has schizotypal personality disorder and, therefore, he cannot work. Dr. McArthur testified at length about appellant's personality characteristics. Dr. McArthur testified that appellant is highly depressed, highly suspicious, very isolated, does not display his emotions, and is uncomfortable in groups. (Tr. 281-85). He also described the traits a person with schizotypal personality disorder would display. (Tr. 283-84). Given this type of testimony and appellant's defense in general, we can conclude that appellant put these personality traits at issue in this trial. It was reasonable for the prosecutor to seek to rebut appellant's evidence regarding these personality traits. Therefore, it was not plain error to allow Karen to testify about appellant's personality traits that demonstrated that appellant was not highly depressed, highly suspicious, isolated, unemotional, or uncomfortable in groups.
 {¶ 26} Next, appellant contends that the court should not have permitted Tammy to testify about his alleged "rocky" relationship with Katy and Kassandra.
 {¶ 27} On direct examination, the prosecutor asked Tammy questions about whether she maintained contact with appellant after they divorced. She stated that her only contact with appellant was when he would call their daughters. (Tr. 240). She stated that he only contacted them once after he moved to Florida. (Tr. 240). Tammy also stated that appellant occasionally upset the girls when he called them. (Tr. 240-41). And she testified that when she spoke with appellant, he sometimes argued with her about putting ideas in the girls' heads. (Tr. 241-42).
 {¶ 28} Appellant failed to object to Tammy's statements that he now alleges were inadmissible. (Tr. 761-63). Thus, once again, he has waived all but plain error.
 {¶ 29} Prior to this testimony, the prosecutor had asked Tammy questions regarding appellant's behavior and personality while they were married. (Tr. 235-40). He then asked her if she maintained contact with appellant after their divorce. (Tr. 240). It appears that the reason for asking that question and the questions that followed was an attempt to determine if Tammy could shed any light on appellant's personality and behavior after the time she and appellant divorced. It does not seem that the aim of the questions was to delve into appellant's relationship with his daughters. In fact, the prosecutor asked Tammy during that line of questioning whether appellant, during those times when she talked to him, exhibited any strange behaviors. (Tr. 241).
 {¶ 30} This testimony was not put on to demonstrate that appellant had a "rocky" relationship with his daughters as he asserts. Instead this testimony was merely background information to Tammy's testimony about her observations of appellant's personality. Therefore, it was not plain error for the court to admit this testimony.
 {¶ 31} Finally, appellant asserts that the court erred in allowing Dr. Susan Friedman to mention his alleged sexual misconduct.
 {¶ 32} Dr. Friedman is a forensic psychiatrist who plaintiff-appellee, the State of Ohio, called as an expert witness. During her testimony, Dr. Friedman made reference, in passing, to the allegations that appellant sexually abused his daughter. However, she never testified directly about those allegations. For instance, the prosecutor asked Dr. Friedman to describe the background that she learned about appellant from her interview with him and from the various reports she reviewed. In response, Dr. Friedman discussed appellant's childhood, his two marriages, his children, and his religion. (Tr. 344-45). When discussing appellant's divorce from Karen, Dr. Friedman stated that appellant "got divorced from Karen after — after the allegations about his daughter." (Tr. 345). Dr. Friedman continued with appellant's history noting that he worked as a State Highway Patrol Trooper. (Tr. 347). She then stated that appellant told her that he retired from his job on the advice of his attorney and his ex-wife "due to the allegations against him." (Tr. 347). Dr. Friedman moved on to discuss the onset of appellant's psychiatric symptoms. She stated that appellant told her that prior to his daughter's allegations of assault, he did not have any symptoms. (Tr. 349). Finally, in response to a question about appellant's Windsor Hospital records, Dr. Friedman testified that appellant had stated that he felt suicidal after the allegations by his daughter. (Tr. 354).
 {¶ 33} As was the case above, appellant failed to object to the above testimony by Dr. Friedman that he now takes issue with. Additionally, as discussed above, appellant never objected when Dr. McArthur testified about the allegations of abuse between appellant and his daughter. Thus, appellant has waived review of this alleged error.
 {¶ 34} Based on the foregoing, appellant's first assignment of error is without merit.
 {¶ 35} Appellant's second assignment of error states:
 {¶ 36} "THE CONVICTION OF THE DEFENDANT-APPELLANT, KENNETH BROWNE, WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 37} Here appellant argues that his convictions were against the manifest weight of the evidence. He claims that he presented ample evidence to prove his affirmative defense. Appellant specifically references his expert's testimony.
 {¶ 38} In determining whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Thompkins (1997),78 Ohio St.3d 380, 387, 678 N.E.2d 541. "Weight of the evidence concerns `the inclination of the greater amount of credibleevidence, offered in a trial, to support one side of the issue rather than the other.'" Id. (Emphasis sic.) In making its determination, a reviewing court is not required to view the evidence in a light most favorable to the prosecution but may consider and weigh all of the evidence produced at trial. Id. at 390, 678 N.E.2d 541.
 {¶ 39} Still, determinations of witness credibility, conflicting testimony, and evidence weight are primarily for the trier of the facts. State v. DeHass (1967), 10 Ohio St.2d 230,227 N.E.2d 212, paragraph one of the syllabus.
 {¶ 40} Appellant was convicted of violating R.C.2919.21(A)(2), which provides in pertinent part:
 {¶ 41} "(A) No person shall abandon, or fail to provide adequate support to:
 {¶ 42} "* * *
 {¶ 43} "(2) The person's child who is under age eighteen."
 {¶ 44} Furthermore, if the offender has failed to provide support under R.C. 2919.21(A)(2) or (B) for a total accumulated period of 26 weeks out of 104 consecutive weeks, whether or not the 26 weeks were consecutive, then the violation is a fifth-degree felony. R.C. 2919.21(G)(1).
 {¶ 45} R.C. 2919.21(D) provides for an affirmative defense. It states: "It is an affirmative defense to a charge of failure to provide adequate support under division (A) of this section * * * that the accused was unable to provide adequate support * * * but did provide the support that was within the accused's ability and means."
 {¶ 46} The evidence at trial clearly proved that appellant violated R.C. 2919.21(A)(2) on both counts.
 {¶ 47} Tammy testified that appellant was ordered, per their dissolution, to pay child support for Katy and Kassandra. (Tr. 234; State Ex. 1). Kathy Frankford is a CSEA caseworker who was assigned to the child support case involving Katy and Kassandra. She testified that appellant failed to make support payments for at least 26 weeks out of 104 consecutive weeks. (Tr. 186).
 {¶ 48} Karen testified that appellant was ordered, per their divorce decree, to pay child support for Nicole, Sean, and Ashley. (Tr. 254-55; State Ex. 4). Lisa Weyand is a CSEA caseworker who was assigned to the child support case involving Nicole, Sean, and Ashley. She testified that from July 2000 until the date of the trial, which was February 28, 2005, appellant only made one child support payment, which CSEA intercepted from a pension. (Tr. 219).
 {¶ 49} Appellant did not present any evidence to contradict the above testimony. Thus, it is clear that appellant failed to support his children for at least 26 out of 104 consecutive weeks. Therefore, we must move on to consider whether the weight of the evidence supported appellant's affirmative defense of being unable to work and provide support.
 {¶ 50} Appellant called Dr. McArthur in support of his defense. Dr. McArthur testified that he compared his findings with the Windsor report in order to determine that appellant had an ongoing psychological problem. (Tr. 279). From his testing of appellant, Dr. McArthur found that appellant is particularly depressed, shows signs of schizotypal thinking, is highly suspicious, is very distanced from friendships and relationships, and has a lot of peculiar thinking. (Tr. 281-82). He stated that these findings were highly consistent with the Windsor report. (Tr. 282).
 {¶ 51} Dr. McArthur then described schizotypal personality disorder. He stated that a person with this disorder has had the condition their entire life; it is not a disorder that just occurs at some point in time. (Tr. 283). The main characteristics are delusions, fear of a conspiracy, odd beliefs, and magical thinking. (Tr. 283). Dr. McArthur then described how appellant fit these characteristics. He stated that earlier in his history, appellant had preoccupations with the devil. (Tr. 283). He further stated that appellant has peculiar suspicions about what has happened to him and what is going on around him and has paranoid thinking. (Tr. 284). He also stated that appellant has constricted affects, which means that he has a hard time displaying emotions, and that he has a lack of friends and suffers from excessive social anxiety. (Tr. 284).
 {¶ 52} Dr. McArthur also indicated that he reviewed a Social Security Administration report on appellant. It too concluded that appellant suffers from depression and schizotypal personality problems and, therefore, he is unable to maintain employment. (Tr. 286-88).
 {¶ 53} Dr. McArthur opined, based on the above, that appellant is not able to work at this time nor was he able to work in 2000. (Tr. 288-89).
 {¶ 54} On cross-examination, Dr. McArthur admitted that the Windsor report indicated that testing neither confirmed nor ruled out a personality disorder diagnosis. (Tr. 292). Dr. McArthur also stated that although appellant has been suffering with this disorder for at least four years, he has not sought psychological treatment, which is unusual. (Tr. 295-96). He also admitted that there were certain characteristics of schizotypal personality disorder that appellant did not display. (Tr. 303-305). Finally, Dr. McArthur admitted that the Social Security Administration interview to determine if appellant was eligible for benefits was conducted over the telephone, which was not the best way to make such a determination. (Tr. 318).
 {¶ 55} In rebuttal, the prosecutor called Dr. Friedman. She too conducted an interview with appellant and reviewed the Windsor report. She also reviewed Dr. McArthur's evaluation.
 {¶ 56} Dr. Friedman testified that in gathering appellant's history from him, appellant related to her that he retired from his job as a state trooper on the advice of his attorney and his ex-wife due to the allegations against him. (Tr. 347). Appellant also told Dr. Friedman that after he moved to Florida he applied for several jobs but was never hired and he attributed that to his legal problems. (Tr. 347).
 {¶ 57} Dr. Friedman asked appellant when his first psychiatric problems arose and appellant told her that prior to the accusation by his daughter, he did not have any problems. (Tr. 349). He also told Dr. Friedman that he had undergone psychological testing before being hired as a state trooper, which did not prohibit him from being hired as a state trooper. (Tr. 349). Additionally, appellant told her that he was not depressed prior to his daughter's accusations. (Tr. 349).
 {¶ 58} Appellant also related many symptoms of depression to Dr. Friedman. He told her that his appetite fluctuated, that he had trouble sleeping, that he had less energy, and that he did not enjoy things that he had enjoyed in the past. (Tr. 351).
 {¶ 59} Next, Dr. Friedman testified that many of appellant's "psychotic" behaviors can be normal. For instance, she stated that while appellant felt that the police and prosecutors in Columbiana County were out to get him, he did not feel that way about police and prosecutors in general. (Tr. 352). Dr. Friedman stated that this was within the range of normal when someone is facing felony charges. (Tr. 352-53).
 {¶ 60} Dr. Friedman relayed some of her other findings to the jury. She stated that during her interview with appellant he maintained good eye contact, he gave appropriate responses to her questions, he had a somewhat depressed expression, his thinking was organized, and he was coherent. (Tr. 360). Dr. Friedman further testified that appellant told her that he was not hearing voices or seeing visions, he did not believe he had special powers, he did not have any general paranoia, and he had no thoughts of hurting himself or others. (Tr. 360-61). Additionally, appellant performed well on a cognitive examination. (Tr. 361).
 {¶ 61} Like Dr. McArthur, Dr. Friedman stated that schizotypal personality disorder is a chronic disorder that a person develops in early adulthood or sooner. (Tr. 362).
 {¶ 62} Finally, Dr. Friedman concluded that appellant did not meet the criteria for schizotypal personality disorder. (Tr. 364). She based this conclusion on many things including that appellant did not have eccentric beliefs and that he did not have a long-standing problem prior to the accusation by his daughter and in fact lived a normal life prior to the accusation including performing well in school and the military, having friends, marrying, and being employed. (Tr. 364-65).
 {¶ 63} Dr. Friedman determined that appellant suffers from major depressive disorder. (Tr. 368). She opined that the abuse allegations in 2000 triggered this depression. (Tr. 368). Dr. Friedman further opined that appellant's psychological problems do not render him unable to obtain or maintain employment. (Tr. 364, 369).
 {¶ 64} To further bolster Dr. Friedman's opinion, appellee also relied on testimony from appellant's ex-wives. Both women testified that while each was married to appellant he never had trouble with authority, was not overly sensitive or overly superstitious, did not display any magical thinking or report any unusual perceptual experiences, never told them of any paranoid thoughts, was not awkward in social settings, and did not have difficulty with relationships. (Tr. 235-40, 256-61).
 {¶ 65} This case was basically a battle of the experts. Appellant's expert testified that appellant has schizotypal personality disorder that prevents him from working. On the other hand, the state's expert testified that while appellant does suffer from major depression, he does not suffer from schizotypal personality disorder, and he is able to work. Which expert to believe was a question of credibility for the jury to decide. When a jury is faced with the conflicting conclusions of two experts, such conflicting testimony does not warrant reversal simply because the jury chose to believe the state's expert.State v. Bryant, 9th Dist. No. 22723, 2006-Ohio-517, at ¶ 19, reversed on other grounds by In re Ohio Criminal SentencingStatutes Cases, 109 Ohio St.3d 509, 849 N.E.2d 284,2006-Ohio-2721. Thus, we cannot conclude that the jury lost its way and created a manifest miscarriage of justice. Accordingly, appellant's second assignment of error is without merit.
 {¶ 66} For the reasons stated above, the trial court's judgment is hereby affirmed.
Waite, J., concurs.
DeGenaro, J., concurs.